ALTENBERND, Chief Judge.
K.A. and S.A. appeal a judgment terminating their parental rights to three children. We affirm that portion of the judgment that terminates the parents’ rights to the youngest child, an infant who suffered abuse as a result of egregious conduct when he was in the custody of one or both of the parents. See § 39.806(1)(f), Fla. Stat. (2002). We reverse the order terminating the parents’ rights to the two older children because the Department of Children and Family Services failed to present clear and convincing evidence that termination was in the manifest best interests of these two children and that termination was the least restrictive means to protect them.
K.A. and S.A. are the unmarried parents of three minor children. On May 19, 2001, when the children were ages four years, two years, and two months, the mother brought the infant to the emergency room. When an examination of the baby revealed severe injuries, the Department was notified and began an abuse investigation. The Department immediately placed all three children with a maternal aunt. On August 15, 2001, the Department filed a “petition alleging dependency and for termination of parental rights” against both parents, seeking termination of the parents’ rights to all three children based upon the abuse of the infant. The Department did not offer the parents a case plan.
At the termination trial in November 2002, the Department sought to terminate the parents’ rights to all three children pursuant to section 39.806(l)(f), which permits termination when a parent engages in egregious conduct or has the opportunity and capability to prevent and knowingly fails to prevent egregious conduct that threatens the life, safety, or physical, mental or emotional health of the child or the child’s siblings. The evidence presented by the Department focused primarily on the infant: the extent of the infant’s injuries, who may have inflicted the injuries, and how the injuries may have occurred. There was little evidence presented that related to the other two children.
*707 According to the evidence at trial, on May 19, 2001, the mother brought her two-month-old infant to the emergency room because his leg was swollen. She told emergency room personnel that she thought the baby might be having a reaction to ant bites. According to the emergency room physician, the baby did not initially appear uncomfortable and the leg was only mildly to moderately swollen; however, the child would cry in pain when his leg was moved. A series of diagnostic tests revealed the infant had a spiral fracture of his femur, a skull fracture, and three rib fractures. These injuries were in various stages of healing, leading the medical experts to opine that they occurred on at least three separate occasions. The pediatrician concluded the injuries were consistent with shaken baby syndrome.
It is not clear how the baby suffered these injuries or who specifically inflicted them. However, the testimony was undisputed that the infant was always in the care of the mother or father, with the exception of one time when the baby was left with the mother’s sister while the mother watched a movie, and a second time when the baby was left with a family friend for twenty minutes while the mother went to the grocery store. Both of the babysitters denied inflicting any abuse on the child, and there was no evidence to suggest they were responsible for any of the child’s injuries.
The parents also denied intentionally inflicting the abuse. They presented various hypotheses as to how the injuries might have occurred, but these theories were rejected by the medical experts based upon the types of injuries the child had sustained. The parents also denied knowing about the baby’s injuries until the date the child was brought to the emergency room. However, a medical expert who reviewed the baby’s medical records opined that anyone changing the child’s diaper should have been aware of the femur fracture.
As to the two older children, there was no evidence that these children had been abandoned, abused, or neglected. When these two children were initially sheltered, a full medical examination of them revealed no injuries with the exception of some minor scarring of unknown origin on the middle child’s buttocks.
The eldest child was in a Head Start program for two years in 2000 and 2001. The manager of the program testified on behalf of the mother. According to the manager, she saw the mother and the children five days a week when the mother dropped off the eldest child at the Head Start program and also saw them during home visits. The eldest child rarely, if ever, missed a day of preschool. The mother often talked to the manager to see how the eldest child was progressing in the program. The mother consistently brought the other two children into the Head Start facility. All three children were neatly and appropriately dressed, with the eldest child in clothes that were often ironed and starched. The children’s hair was groomed. The manager described the mother as a good parent who was concerned about her children.
While these proceedings were pending, the parents were permitted supervised visitation with the children at the home of the maternal aunt who was caring for them. The mother visited with the children daily during the year and a half before trial and provided significant assistance in the children’s care, in the hopes that she could provide stability for them and minimize the disruption in their lives. The father also visited regularly, as often as three times per week.
The child protective services caseworker visited the children’s home on a monthly *708 basis and often saw the mother there. The caseworker testified the maternal aunt’s home was well kept and the children were “very well taken care of.” She was aware that the mother visited the children daily. She described the mother’s interaction with the children as “very positive” and related how the mother would play with the children, eat with them, and braid their hair. She knew the mother sometimes brought over clothing for the children or other things they might need.
The guardian ad litem, who had investigated the case for over a year and who had significant experience working with handicapped children and “at-risk moms,” opposed the termination of the parents’ rights to the three children. Rather, the guardian recommended readjudicating the children dependent, retaining their placement with the maternal aunt, and permitting the parents to enter into a case plan with the Department with a goal of reunification. The guardian noted that the parents adequately provided for the children’s housing, clothing, health, and nutritional needs. The guardian was mainly concerned that the parents receive education and support regarding child development, i.e., help in determining what level of supervision and interaction was appropriate for children in different developmental stages. The guardian described the family as “close knit” and indicated that the children were very bonded with their parents. The guardian opined that “with assistance, the parents would be very capable parents.”
At the conclusion of the trial, the trial court entered an order terminating the parental rights of the mother and father to all three children. In determining that termination was appropriate, the trial judge focused primarily on the abuse of the infant. The trial judge expressed concern that the parents had suggested their eldest child may be to blame for the injuries to the infant. As to the middle child, the trial judge made no specific findings of fact.
There is no question that the abuse of the infant in this case constituted egregious conduct that threatened the life and health of this child. See N.L. v. Dep’t of Children & Family Servs., 843 So.2d 996, 1001 (Fla. 1st DCA 2003) (holding egregious conduct occurred when infant was shaken forcefully enough to break bones); M.C. v. Dep’t of Children & Family Servs., 814 So.2d 449 (Fla. 4th DCA 2001) (holding egregious conduct occurred with one-year-old child who had broken arm, skull fracture, bruising, healing rib fracture, and other indications of neglect). In the context of egregious conduct, this court has held that “where there is evidence that a child suffered abuse by one or both of the parents present,” there is clear and convincing evidence to support the termination of parental rights of both parents. See M.W. v. State, Dep’t of Children & Families (In re B.J.), 737 So.2d 1227, 1228 (Fla. 2d DCA 1999) (involving child who was seriously abused at time when both parents were at home with child). Although it is not clear whether the mother, the father, or both inflicted the injuries on this infant, the parents were the only persons to have the opportunity to inflict the totality of these injuries. Moreover a parent who was not present during, or who did not participate in, physical abuse may still have their parental rights terminated if they knowingly failed to protect the child from egregious abuse. See C.S. v. State, Dep’t of Health & Rehabilitative Servs. (In re B.S.), 697 So.2d 914 (Fla. 2d DCA 1997). There was expert testimony that any caretaker changing the infant’s diaper should have been aware of the femur fracture, which appeared to be more than two weeks old. Thus the circuit court could *709 reasonably conclude that one parent perpetrated the abuse and the other parent permitted the abuse or failed to timely seek appropriate medical treatment for the child.
Further, the abuse of this infant on numerous occasions in the first two months of his life supports the trial court’s finding that termination of the parents’ rights is in this child’s manifest best interest and is the least restrictive means available to protect him from continued abuse. See In re T.M., 641 So.2d 410, 413 (Fla.1994) (holding that in cases involving severe or continuing abuse or neglect, “the termination of parental rights without the use of plans or agreements is the least restrictive means”); see also § 39.806(2), Fla. Stat. (2002) (providing, “[r]easonable efforts to preserve and reunify families shall not be required if a court of competent jurisdiction has determined that any of the events described in paragraphs (l)(e)-(i) have occurred”). We thus affirm the trial court’s termination of the parents’ rights to this child.
We reverse, however, the portion of the judgment that terminates the parental rights of the mother and father to the two older children. We recognize that section 39.806(l)(f), Florida Statutes (2002), permits a court to terminate parental rights not only to a child who has suffered abuse by egregious conduct, but also to any siblings of such a child. As such, the Department established a valid statutory ground for terminating these parents’ rights to all three of their children. Further, the supreme court has held that a court can constitutionally terminate the parental rights of parents to a child who has not yet been abused based upon the parents’ past abuse of another child. See Padgett v. Dep’t of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991).
The existence of a ground for termination, however, does not end the inquiry. Before parental rights to a child can be permanently and involuntarily severed, there must be clear and convincing evidence that termination is the least restrictive means to protect the child; in other words, that reunification with the parent poses a substantial risk of significant harm to the child. Padgett, 577 So.2d at 571. Here, there was no competent, substantial evidence that the parents posed a substantial risk of significant harm to the two older children. In fact, there was substantial evidence to the contrary. There was no nexus or predictive relationship between the past abuse of the infant and any prospective abuse of the older children. See A.D. v. Dep’t of Children & Family Servs. (In re G.D.), 870 So.2d 235, 238, 2004 WL 574022, *2 (Fla. 2d DCA 2004).[1] The two older children have not been abandoned, abused, or neglected. By all *710 accounts, they have been well cared for and are closely bonded to their parents. The parents do not suffer from any physical or mental illness or condition that would inhibit their proper care of these children in the future. Further, there is no indication these children were aware of the abuse or present when it occurred or that it had any psychological impact upon them. Under these circumstances, the trial court’s conclusion that the termination of the parents’ rights to the two older children was the least restrictive means of protecting them was not supported by clear and convincing evidence and was clearly erroneous.
Finally, the Department failed to establish by clear and convincing evidence that termination of the parents’ rights to the two older children is in the manifest best interest of these children. See § 39.810, Fla. Stat. (2002).[2] Again, the evidence at trial focused primarily upon the infant. By all accounts, the two older children were not abused. A cursory look at the factors involved in determining a child’s manifest best interests under section 89.810 suggests that were the court to apply these factors to the two older children, individually, the evidence would establish that the best interests of these children would not be served by termination.
It is worth emphasizing that in cases where the Department seeks to terminate parental rights to numerous children, the trial court cannot treat the children as an amorphous group in which the best interests of one will meet the interests of all. Rather, the trial court must individually determine whether the termination of parental rights to each child is permitted by the statute, is the least restrictive means to protect that child, and is in that child’s manifest best interests.
We affirm the judgment to the extent it terminates the parental rights of the parents to the youngest of the three children. We reverse that portion of the judgment that terminates the parents’ rights to the two older children. On remand, if the children are readjudicated dependent, the Department should develop and the trial court should adopt a case plan for these parents with a goal of reunification of the parents and their two older children.
Affirmed in part, reversed in part, and remanded.
NORTHCUTT and COVINGTON, JJ., Concur.

. We recognize that there is a conflict among the district courts of appeal regarding the proper analysis to be applied in cases involving a child who has not been abused but may become a victim of prospective abuse. The Fifth District has held that statutory changes in the laws regarding termination now establish a presumption that the past egregious abuse of one child is predictive of future abuse, thus altering Padgett’s approach in prospective abuse cases. See Dep’t of Children & Families v. B.B., 824 So.2d 1000, 1007 (Fla. 5th DCA 2002); A.B. v. Dep’t of Children & Families, 816 So.2d 684 (Fla. 5th DCA 2002). The Fifth District considers this presumption constitutionally permissible, as long as the parent is provided an opportunity to rebut the presumption. See also C.D. v. Dep’t of Children & Family Servs. (In re T.S.), 855 So.2d 679 (Fla. 2d DCA 2003) (reversing termination but noting that court agrees with conclusion in A.B. that section 39.806(1)(i) is facially constitutional). The Fourth District, however, has concluded that such a presumption is unconstitutional because it relieves the state of its burden to demonstrate that the reunification of parent and child poses a substantial risk of harm to that child. See F.L. v. Dep’t of Children & Families, 849 So.2d 1114 (Fla. 4th DCA 2003). We need not address *710 the facial constitutionality of section 39.806(l)(f) because we conclude that, irrespective of who bore the burden of proof, the trial court's determination that the parents posed a substantial risk of significant harm to the two older children was clearly erroneous.

. We note that Judge Sawaya has suggested that the "manifest best interests” considerations set forth in section 39.810, Florida Statutes (2002), effectively supplant the least restrictive means test discussed in Padgett. See T.P. v. Dep’t of Children & Families, 860 So.2d 1084, 1092-95 (Fla. 5th DCA 2003) (Sawaya, C J., concurring). Certainly the two concepts are interrelated.