TAYLOR, J.
In these cases consolidated for opinion purposes only, S.M., the mother, appeals an order terminating her parental rights to her infant son, J.P. The Department of Children and Family Services (DCF), Guardian Ad Litem, and Attorney Ad Li-tem for the older child, D.O., appeal the order denying their petition to terminate the mother’s parental rights to D.O. We affirm the order terminating the mother’s parental rights to J.P. based on the severe abuse he suffered while in the mother’s care. The trial court’s finding of clear and convincing evidence that the mother engaged in egregious conduct, or had the opportunity and capability to prevent the egregious conduct and knowingly failed to do so, is not clearly erroneous or lacking in evidentiary support. We also affirm the order denying termination of the mother’s parental rights to the older child, D.O., because the petitioners failed to prove by clear and convincing evidence that termination of parental rights was the least restrictive means to protect the child from harm.

Background

J.P. was born on August 28, 2006 by caesarian section delivery. He was pronounced a healthy newborn with high Ap-gar scores. Although the mother suffered no complications during the delivery, she was instructed to refrain from any strenuous activity, heavy lifting, or driving for the first six to eight weeks. J.P.’s father, the mother’s husband, became his primary caregiver. The father assumed responsibility for J.P.’s feedings and diaper changes and attended to his needs at night. On September 11, 2006, when J.P. was two weeks old, the mother and father took J.P. for his first doctor visit. His pediatrician, Alexandria Niewiadomski, examined him and found him healthy.
On October 4, 2006, when J.P. was just over five weeks old, the mother noticed that his eye and arm were twitching and that he had a high fever. The parents took him to the Palm Beach Gardens Medical Center emergency room. Upon his arrival, the baby had to be intubated and placed on a ventilator due to respiratory failure. A nurse informed the parents that J.P. was having a seizure.
J.P. was transferred to St. Mary’s Hospital. There, he was treated by Dr. Roman Pena, a pediatric critical care specialist. Dr. Pena reviewed reports from CAT scans, bone scans, skeletal x-rays, and MRI’s, which showed that J.P. suffered extensive injuries: bilateral subdural he-matomas, or bleeding in the brain; retinal hemorrhages; and multiple bone fractures. The pediatrician concluded these injuries were intentionally inflicted and consistent with Shaken Baby Syndrome. J.P. remained hospitalized until he was placed into a shelter facility for medically fragile children.
Dr. Phillip Colaizzo, a board-certified pediatrician and medical director of the Child Protection Team in Palm Beach County, examined J.P. in the hospital. He conferred with Dr. Pena, reviewed hospital medical records and x-rays, and spoke with both parents. Based on his examination and review of the records, Dr. Colaiz-zo concluded that J.P. had subdural hema-tomas, which were of two different ages. In addition, he had multiple long bone fractures which showed evidence of healing, indicating that they were of different ages. The baby also had a left-sided mul-ti-layered retinal hemorrhage, which was consistent with a shaking impact.
Dr. Colaizzo testified that there were new injuries and old injuries. Some of the injuries were possibly two to three weeks old. The neurosurgeons believed that all of the injuries were acute, meaning within *13 24 to 72 hours; the radiologists felt that some injuries were acute and some were chronic, meaning one to two weeks old. The fractures were to the left leg, both lower legs, and both wrists. Dr. Colaizzo described the leg fractures as those which generally occur from grabbing and twisting. The fractures were not obvious upon visual inspection and could be detected only after x-rays, bone scans, and MRI’s were performed.
Because of the age of the child and the extent, severity, and life-threatening nature of his injuries, Dr. Colaizzo concluded that this was a case of inflicted brain injury and battered child syndrome. He ruled out the possibility that the injuries resulted from any birth-related injury. Dr. Co-laizzo testified that when he interviewed the parents, they said that they had been with J.P. “every minute of the time since he was born.” According to Dr. Colaizzo, one or both parents should have known something was wrong with the baby because “this was not a one-time event.” Because of the child’s extensive head injuries and multiple fractures of his arms and legs, he opined that the child would have shown some indication of stress. He considered it highly improbable that a caregiver who may not have created these injuries would not have known that something was wrong or amiss with the baby. Dr. Colaizzo concluded that the child would be in an extremely high risk situation if he were returned to the parents, because the child was subjected to repeated abuse at a very young age and the parents stated that they were the only ones who had kept the child since his birth.
Dr. Pena also believed that the child would have shown some signs of stress. He testified that shaken babies tend to have symptoms such as seizures and uncontrollable high-pitched crying. Dr. Pena testified that when the older injuries were inflicted the child would have cried out and that his high-pitched cry should have alerted the parents that something was seriously wrong. He further testified that if a body part were broken the child would have cried out any time the broken part was touched.
Dr. Colaizzo also examined the mother’s other child, D.O., who was eleven months older, and took x-rays of her bones and a CAT scan of her head. He found no evidence of physical abuse or neglect as to her. She was a healthy child, who had visited her pediatrician regularly for routine check-ups. However, Dr. Colaizzo said that D.O. might also be at a substantial risk if returned home because of the abuse perpetrated on the younger child and the fact that D.O. was just one-and-a-half years old.
Palm Beach Gardens Detective John Boyle, along with a DCF investigator, briefly met with the mother and father at their residence the morning after J.P. was hospitalized. They lived with the maternal grandmother. Detective Boyle testified that the parents had no clue about what was wrong with the baby. They were unaware of the cause and extent of the baby’s injuries. As the detective continued his investigation, the parents provided multiple explanations as to how the injuries could have occurred. One explanation was that during a scuffle between the parents, the mother pushed the father down and caused him to fall on the baby. A second suggestion was that the injuries occurred during the child’s birth. A third theory was that the father’s sister or her boyfriend could have injured the baby during a visit with the father’s family.[1]
*14 The mother and father told the detective that they had been the baby’s only caregivers and that the father was the primary caregiver. Both parents denied hurting the baby.
As part of his investigation, Detective Boyle reviewed prior offense reports involving the family. He testified that there had been several domestic dispute calls to the maternal grandmother’s home over the past two years involving the mother, the maternal grandmother, and the father. There had also been reports of domestic violence between the mother and the father at other residences. The mother told the detective that she feared the father because of their arguments and physical fights. During the termination of parental rights trial, a DCF agent observed bruises on the mother’s left arm. When she inquired, the mother said that on the previous Sunday the father had beat her, and her mother had called the police.
The DCF investigator interviewed the maternal grandmother, with whom the parents lived. Although the grandmother allowed the parents to live in her home, she knew nothing about what was going on in the home. She worked a great deal and did not have any time to spend with them. The maternal grandmother told the case worker that she had never held the baby in the five weeks he was in her home.
The DCF investigator identified various risk factors which she felt placed both children at substantial risk of significant harm if left in the home with the parents: the severity of J.P.’s unexplained injuries; the fact that the parents had stated that both were the primary caregivers, equally spending time with the child because neither of them was employed; the parents’ statement that no one else had unsupervised access to the child; the parents’ inability to explain the injuries; the fact that neither parent blamed the other for the injuries, and the history of family violence. Another factor was the parents’ inconsistent explanations regarding how the injuries occurred to J.P.
On October 6, 2006, DCF obtained a shelter order for J.P. and D.O. DCF had a comprehensive behavioral assessment performed. The in-depth report recommended that the parents complete a parenting class and receive a domestic violence evaluation and clinical assessment as a possible prelude to reunification. DCF decided to offer no services and instead seek an expedited termination of parental rights.
On October 30, 2006, DCF filed its petition to terminate the parental rights of both parents as to J.P. The petition alleged that the parents “engaged in egregious conduct or had the opportunity or capability to prevent egregious conduct that threatens the life, safety or physical, mental or emotional health of the child and knowingly failed to do so.” The next day, DCF filed an amended petition which sought to terminate the mother’s parental rights to the older sibling, D.O., as well.[2] On November 1, 2006, DCF filed a verified petition seeking an adjudication of dependency as to D.O. An attorney associated with the Foster Children’s Project of the Legal Aid Society of Palm Beach County, Inc., joined in the amended petition as the attorney ad litem for the children. The guardian ad litem for both children testified that she believed it was in the children’s best interest to have both parents’ parental rights terminated. The dependency case manager agreed and expressed her opinion that both children would be at significant risk of substantial harm if returned home.
*15 On April 12, 2007, immediately after DCF concluded its case, the father filed in open court a written surrender of his parental rights to J.P. and took no part in the remainder of the trial.
The mother testified. She said she did not know how the injuries occurred to J.P. or who inflicted them. The father was the primary care giver for the baby during his first five weeks as she was recovering from a second cesarean section surgery. During this period, the parents took the baby to the home of the father’s mother every day. There, they visited with the paternal grandmother, the father’s sister and her boyfriend, and several other family members and neighbors. During these daily visits, loud arguments and squabbles often erupted between the father’s relatives. The mother would take the children outside to avoid the tension. Occasionally, the mother would leave the baby at the paternal grandmother’s home for a short time while she rode with a neighbor to the store or a fast food restaurant.
On October 4, 2006, the mother realized that something was wrong with the baby. Although J.P. seemed fine when he was given a bottle at 9:30 or 10:00 that evening, the mother later noticed that his eye and arm were twitching. The mother asked the father to hand her the baby. The baby felt extremely hot to her, so she checked his temperature. It was 103.6 degrees. The parents took him to Palm Beach Gardens Medical Center and arrived there shortly before midnight.
The mother testified that she did not know that J.P. was having a seizure until the nurse told her. She acknowledged that she had seen J.P. twitch three or four days earlier, but said that the twitching motion that evening was different; it involved his eye and arm and leg on one side and lasted much longer. The mother testified that in the days leading up to the emergency room visit, she had not noticed any change in J.P.’s sleeping, feeding, or crying patterns or seen any bruising or marks on him, other than a very small scratch on his forehead.
The mother testified that she never saw the father mistreat the baby or any other child. She admitted that the father had beaten her four times, but said that the first time he hit her was in September 2006, after J.P. was born. The fight occurred in the maternal grandmother’s home when both children were present. She said that she was afraid for the children’s safety, but she put herself between the father and the children so they would not get hurt. On this occasion, she did not call the police because the father had smashed her phone. She did not leave the house because she could not leave the children at home alone. Their later fights occurred after the children had been removed from the home, and these fights were about the children being taken away. The last time the father hit her, the mother signed papers to have him prosecuted. The maternal grandmother intends to get an eviction notice and a restraining order against the father.
The mother acknowledged that she was afraid of the father and said she intends to terminate her relationship with him because that would be best for the children. She said that DCF never offered her any services, including domestic violence victim counseling, despite knowing that she was a victim. If offered services or a case plan, she said she would attend classes, obtain employment, establish her own home, and comply with any other requirements to bring her children home.
Both parents had weekly visitations with the children after they were sheltered. According to the DCF employees who supervised the visits, the visits went well. The mother interacted appropriately with *16 her daughter, D.O., and brought food, clothes and toys for her. D.O. was happy to see her mother and responded appropriately to her.
In its final order, the trial court terminated parental rights of the parents to J.P. due to egregious abuse. After reciting the evidence presented, the trial court found that:
1. The medical testimony in this case was compelling and undisputed. The physicians who treated baby [J.P.] were universal in their testimony that baby [J.P.] sustained life threatening injuries that were inflicted on multiple occasions. This was shown by multiple healing of several injuries.
[[Image here]]
5. The medical testimony is also undisputed, that because of baby [J.P.’s] young age, it would have been impossible for him to inflict these injuries through any actions of his own. This child is too young to crawl or stand up. Therefore, he could not have in any way inflicted these injuries himself. These injuries were life threatening, as one doctor testified, “baby [J.P.] was at great risk of dying.”
6. The parents, [the father] and [S.M.], were the primary and exclusive care givers of baby [J.P.]. They lived in a single bedroom together. Even when they visited relatives of [the father], the mother was present with the child.
7. It is also important to note that the mother was aware of the violent and argumentative nature of [the father’s] family when she exposed baby [J.P.] to that family.
8. The parents could not have helped but notice baby [J.P.’s] injuries if they did not inflict the injuries themselves. The medical testimony is that baby [J.P.] was injured over a number of traumatic incidents, and the undisputed medical testimony is that it appears that the latest incident that brought [J.P.] to the hospital was caused by a shaking of the baby.
[[Image here]]
10. The Department and the Foster Children’s Project have shown by clear and convincing evidence that the mother either caused this abuse or failed to protect baby [J.P.] from this abuse.
11. The mother failed to protect herself from abuse in this case. She exposed her children to known abusers and people with violent tendencies.'
12. It is clear and convincing that the abuse to baby [J.P.] was egregious and life threatening as defined under Fla. Stat. 39.806(1)©.
The trial court denied the petition to terminate the mother’s parental rights to her daughter, D.O. The court concluded that DCF and the Foster Children’s Project did not show by clear and convincing evidence that termination of the mother’s parental rights was the least restrictive means of protecting D.O. It noted that services were not provided to the mother that could assist her in safely caring for D.O. and bringing about their reunification. The court adjudicated D.O. dependent and ordered the Department to formulate a case plan with the dual goals of reunification and adoption. The court also prohibited any future contact between the father and any member of his family with the child.

Mother’s Appeal (07-2813)

The mother appealed the order of termination of parental rights to J.P. DCF petitioned to terminate the mother’s parental rights to J.P. pursuant to section 39.806(1)©, Florida Statutes (2006). That section permits termination of parental rights:
*17 (f) When the parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child’s sibling.
§ 39.806(l)(f), Fla. Stat. (2006).
Egregious conduct is defined as:
... abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such an intensity, magnitude, or severity as to endanger the life of the child.
§ 39.806(l)(f)(2), Fla. Stat. (2006).
The Florida Supreme Court, recognizing the sanctity of the biological connection, has held that clear and convincing evidence is required to sever the biological parent-child link. In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla.1995). To meet the clear and convincing evidence standard, the evidence must be credible, the memories of the witnesses must be clear and without confusion, and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy. Id. (quoting In re Davey, 645 So.2d 398, 404 (Fla.1994)).
Without question, shaking a baby until his bones break constitutes egregious conduct threatening the life of the child. See In re K.A., 880 So.2d 705, 708 (Fla. 2d DCA 2004) (citing N.L. v. Dep’t of Children & Family Services, 843 So.2d 996, 1001 (Fla. 1st DCA 2003)). In this case, the medical testimony established that the infant, J.P., suffered subdural hematomas, retinal hemorrhages, and multiple bone fractures consistent with Shaken Baby Syndrome.
Although the evidence did not identify the person who inflicted these injuries, testimony was presented that the infant was always in the care of the mother or father. Both parents denied inflicting the abuse, and neither parent blamed the other. They offered different explanations as to how the injuries might have occurred, but the medical experts rejected these theories as inconsistent with the type of injuries sustained by the infant. The parents also denied knowing about the baby’s injuries before their visit to the hospital emergency room. But the doctors who examined the baby said that the parents should have been, aware that something was wrong with the baby.
Based on the evidence, we cannot say that the trial court clearly erred in finding that there was clear and convincing evidence of egregious abuse or failure to protect J.P. from egregious abuse to support termination of the mother’s parental rights. See In re K.A., 880 So.2d at 708 (finding termination of parental rights of infant justified where, although it was not clear whether the mother, the father, or both inflicted the injuries on the infant, evidence that only the mother and father had the opportunity to inflict such injuries was sufficient to show that the parents had engaged in egregious conduct or knowingly failed to protect the child from egregious abuse); In re B.J., 737 So.2d 1227, 1228 (Fla. 2d DCA 1999) (“[Wlhere there is evidence that a child suffered abuse by one or both of the parents present, there is clear and convincing evidence of egregious abuse to support termination of parental rights of both parents.”); see also, D. Children v. Dep’t of Children & Family Services, 820 So.2d 980, 984 (Fla. 4th DCA 2002) (applying same principle in dependency case where either mother or father could have inflicted injuries and family remained intact).

*18
D.C.F.’s appeal (07-2663)

D.C.F., the Guardian Ad Litem, and Attorney Ad Litem from the Foster Children’s Project appealed that portion of the final judgment which denied their petition to terminate the mother’s parental rights to D.O. They argue that the trial court erred by terminating the mother’s parental rights to J.P. upon an express finding of egregious conduct under section 39.806(1)© but failing to terminate the mother’s parental rights as to the older sibling, D.O.
In its order, the trial court found that “there was nothing in the record to show that [D.O.] sustained any abuse at the hands of the mother; she was reviewed by doctors in the past and it did not appear that the child had been abused in the past.” Relying on K.A., the court ruled that it could not properly terminate the mother’s parental rights to D.O. because DCF had failed to show by clear and convincing evidence that termination of parental rights is the least restrictive means of protecting the child from harm.
In K.A. the Second District reversed termination of the parents’ rights to two older children where DCF had proven egregious conduct as a valid ground for termination of parental rights under section 39.806(1)© as to all the minor children, including those who were not shown to have been abused, but had failed to prove that termination of parental rights was the least restrictive means of protecting the two older children.
Under § 39.806(1)©, Fla. Stat. (2006), egregious abuse of one child provides a sufficient ground for termination of parental rights as to that child’s siblings. See K.A., 880 So.2d at 709; T.P. v. Dep’t of Children & Family Servs., 935 So.2d 621, 625 (Fla. 3d DCA 2006); Dep’t of Children & Families v. B.B., 824 So.2d 1000, 1007 (Fla. 5th DCA 2002). In B.B., the Fifth District stated that “no additional proof is necessary to establish a likelihood that an abused child’s sibling will also be abused,” because section 39.806(1)© “represents a legislative expression that parents who have committed egregious acts of abuse against one child pose an unacceptable risk that they will abuse their remaining children.” Id. We agree, however, with the Second District’s holding in K.A. that, because parents have a fundamental liberty interest in raising their children, DCF must still present clear and convincing evidence that termination is the least restrictive means to protect the child from harm. K.A., 880 So.2d at 709 (citing Padgett v. Dep’t of Health & Rehab. Servs., 577 So.2d 565, 571 (Fla.1991)).
In Padgett v. Department of Health & Rehabilitative Services., 577 So.2d 565, 571 (Fla.1991), the Florida Supreme Court held that in every case of termination of parental rights there must be a showing by clear and convincing evidence that reunification of parent and child poses a substantial risk of significant harm to the child, and that termination of rights is the least restrictive means of protecting the child from serious harm. The “least restrictive means” test articulated in Padgett was reiterated by the supreme court in Florida Department of Children & Families v. F.L., 880 So.2d 602 (Fla.2004).
In F.L., the Supreme Court analyzed the constitutionality of section 39.806(l)(i), which was enacted by the legislature after the court decided Padgett. Section 39.806(l)(i) provides for termination of parental rights where there has been a prior involuntary termination of rights to a sibling. The court held that this new statutory ground for terminating parental rights meets constitutional muster only if, in addition to proof of a prior involuntary termination of rights to a sibling, the state proves that there is a substantial risk of *19 significant harm to the current child and that the termination of parental rights is the least restrictive means of protecting the current child from harm. In determining whether termination of a parent’s rights is the least restrictive means of protecting the child, the trial court must consider the totality of the circumstances. F.L., 880 So.2d at 608.
Because section 39.806(l)(f) similarly permits a court to terminate parental rights to a child based on prospective abuse, we believe the same constitutional analysis applies here., Thus, to comport with constitutional requirements, the state must establish that termination is the least restrictive means of protecting the sibling of the abused child from serious harm under section 39.806(l)(f). See J.F. v. Dep’t of Children & Families, 890 So.2d 434, 441 (Fla. 4th DCA 2004) (applying the rationale of F.L. to a prospective abuse case under section 39.806(h) and holding that termination based on the single act of committing manslaughter or a felony assault against another child must be based on proof that the parent currently poses a substantial risk of significant harm to the current child and that termination of parental rights is the least restrictive means of protecting the current child from harm).
We conclude that the trial court properly applied K.A. and correctly considered constitutional criteria in ruling on the petition for termination of the mother’s parental rights to the older child, D.O. Rather than resting termination of parental rights to D.O. solely upon its decision to terminate rights to J.P., the court placed the burden of proof on DCF to establish by clear and convincing evidence that termination is the least restrictive means of protecting D.O. from harm. In his written order, the trial judge noted that there was no evidence of abuse to the older child, D.O. He expressed his concern that the mother had failed to protect herself from abuse and had exposed the children to an abusive and violent environment. The record shows that the mother had taken steps to end her abusive relationship with her husband and was highly motivated to improve her parenting skills and ability to care for her children. There was no evidence presented at trial that the mother suffered from any mental or emotional condition that would prevent her from benefiting from the services the court ordered for her. “The least restrictive means are those that offer the parent a case plan and time to comply with the plan so as to obtain reunification with the child.” Padgett, 577 So.2d at 565. In short, the trial court assessed the totality of the circumstances in concluding that termination of the mother’s parental rights was not the least restrictive means of protecting D.O. from harm.
We affirm termination of the mother’s parental rights to J.P., and further affirm that portion of the order denying termination of the mother’s parental rights to D.O., adjudicating D.O. dependent, and requiring a case plan for the mother.
FARMER, J., and DAVIDSON, LISA, Associate Judge, concur.

. Detective Boyle interviewed the father's sister and her boyfriend, and based on his investigation, concluded that suggestions that they caused J.P.’s injuries were unfounded.

. J.P.’s father was not the father of D.O.