SILBERMAN, Chief Judge.
K.D. and Z.H. are the parents of twin boys, Z.C.(l) and Z.C.(2), who were infants when they were sheltered after Z.C.(l) suffered severe injuries while he was in the parents’ care. The Department of Children and Families (DCF) filed an expedited petition to terminate the parental rights to both children based on egregious conduct' toward Z.C.(l) under section 39.806(l)(f), Florida Statutes (2009), and aggravated child abuse of Z.C.(l) under section 39.806(l)(g). Although the trial court found that the Department established these statutory grounds by clear and convincing evidence, it declined to terminate parental rights based on its sua sponte consideration of an alternative placement in a permanent guardianship with the maternal grandparents. The trial court entered separate orders denying DCF’s petition and placing the children in the permanent guardianship.
We reverse the order terminating parental rights because the trial court misapplied the manifest best interests and least restrictive means tests by basing its decision not to terminate solely on the availability of the alternative placement. We reverse the order placing the children in a permanent guardianship because the trial court was precluded as a matter of law from considering this alternative placement at this stage in the proceedings. This court, sua sponte, has exercised its en banc review of this case because the case addresses recurring issues regarding the termination of parental rights to a child based on the abuse of a sibling. We have determined that clarification is necessary to maintain uniformity in our decisions. Thus, we take this opportunity to clarify the manifest best interests and least restrictive means tests in such cases in the context of the trial court’s erroneous application of those tests. In addition, we address the nexus test derived from Padgett v. Department of Health & Rehabilitative *980 Services, 577 So.2d 565 (Fla.1991), in the context of the trial court’s proper application of that test.
I. Fads and Procedural Background.
Z.C.(l) and Z.C.(2) are identical twin boys who were born on October 28, 2009. The twins were born healthy and had a normal pediatric checkup on November 5, 2009. They lived alone with the parents, and there is no indication that they had ever been harmed while in the care of relatives.
In mid-November 2009, the Mother attended a family party with the twins. Those attending the party claimed that the children appeared to be fine. At some point after the party, however, the parents claimed that they noticed that Z.C.(l)’s leg was dangling at an odd angle. They took him to the hospital. At the hospital, the doctors diagnosed Z.C.(l) with a recent, severely displaced fracture of the left femur. They also diagnosed a healing skull fracture and a healing rib fracture. The matter was reported to law enforcement.
Law enforcement interviewed the parents about the events of the day; the evidence did not support the parents’ version of events after the Mother left the party. The parents initially told law enforcement that the Mother drove straight home. After law enforcement confronted the Mother with evidence that she had gone to Wal-Mart, the Mother changed her story. She claimed she took the twins to Wal-Mart on her way home from the party. But the interviewing detective had already obtained the Wal-Mart security footage which showed the Mother shopping alone.
The Mother changed her story again and said she picked up the Father and drove to Wal-Mart after the party. She claimed that the Father stayed in the car with the twins while she shopped. When the Mother returned to the car, the Father got out and helped her load the shopping bags into the trunk. The Father corroborated this version of events. But Wal-Mart security footage showed the Mother by herself loading shopping bags into the backseat of a seemingly empty car. Despite this contradictory evidence, the parents adhered to this version of events. They were unable to offer an explanation for Z.C.(l)’s injuries.
DCF believed that the parents were being evasive and uncooperative in an effort to avoid prosecution for felony child abuse. Concluding that no case plan for reunification would be viable under these circumstances, DCF elected not to pursue a dependency proceeding. Instead, it filed an expedited petition for termination of parental rights. DCF alleged egregious conduct toward and aggravated child abuse of Z.C.(l) and maintained that these circumstances warranted termination as to both children.
The trial court found the parents’ testimony incredible and accepted medical testimony that Z.C.(l) had been subjected to two or three instances of severe abuse during his seventeen days of life. The trial court concluded that DCF had established that the parents committed egregious conduct toward and aggravated abuse of Z.C.(l). The more difficult question for the trial court was whether these circumstances warranted termination of parental rights to Z.C.(2) who did not appear to have suffered any abuse similar to the abuse endured by his twin. Ultimately, the evidence convinced the trial court that the parents had a “mutual commitment to lying and covering up the abuse of a child whose sibling can, at any time, be equally susceptible to the kind of aggravated child abuse proven against his twin brother.”
*981 The trial court then considered the children’s manifest best interests. It made an unusual placement decision, one not advocated by any of the parties. As the trial court explained:
The Court considered the cases noted above, and finds that grounds for TPR and nexus were shown and it is clearly in the best interests of the twins to maintain their joint placement. Nevertheless, the Department failed its burden of proving that termination of parental rights was the “least restrictive” alternative available to these parties. Another option is available that meets half way between termination of rights/adoption and the impossibility of reunification, and that is permanent guardianship.
The court entered an order denying DCF’s petition to terminate parental rights and subsequently entered a second order placing the children in a permanent guardianship with the twins’ maternal grandparents. In the trial court’s view, a guardianship could ensure the children’s safety while allowing regular visitation between the children and their parents. DCF and the Guardian ad Litem Program (GAL) challenge these orders on appeal.[1]
II. The applicable legal framework.
For a better understanding of the principles at issue, we must examine the trial court’s actions in the applicable legal framework. Chapter 39 expressly requires DCF to prove the following elements to support a termination of parental rights: (1) that at least one of the grounds set forth in section 39.806 has been met, and (2) that termination would be in the manifest best interests of the children under section 39.810.[2] §§ 39.802(4), 39.809(1).
In order to protect the parents’ constitutional right to parent their children without governmental interference, the Florida Supreme Court has held that chapter 39 implicitly requires DCF to prove that termination is the least restrictive means of protecting the children from serious harm. See Fla. Dep’t of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004); Padgett, 577 So.2d at 571. In the same vein, the supreme court has determined that if the termination is based solely on the abuse of a sibling, DCF must also prove that there is a substantial risk of significant harm to the child resulting from the abuse of the sibling. Id. As will be discussed later, this requirement has been referred to as the “nexus test.”
Of the twelve grounds listed in section 39.806, DCF alleged those set forth in subsections (l)(f) and (g). Subsection (l)(f) provides for termination if “[t]he parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent *982 egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child’s sibling.” Subsection (l)(g) provides for termination if “[t]he parent or parents have subjected the child or another child to aggravated child abuse as defined in s. 827.03, sexual battery or sexual abuse as defined in s. 89.01, or chronic abuse.”
When DCF proceeds with termination under these sections, it may file an expedited petition for termination of parental rights without filing a separate petition for dependency. §§ 39.802(5), 39.806(3). DCF filed such an expedited petition in this case in which it requested that the court adjudicate the children dependent and terminate parental rights. DCF also filed a case plan with a permanency goal of adoption.
If the court finds that DCF met its burden of proving the elements by clear and convincing evidence, it must grant the petition for termination of parental rights and proceed with adoption of a child in its custody. § 39.811(2). If the court finds that DCF has not met its burden of proof, its powers of disposition are limited by section 39.811(1). If grounds for dependency have been established, the court is required to adjudicate the children dependent and enter an order either (1) continuing the children in their out-of-home placement with a case plan, or (2) returning the children to their parents and retaining jurisdiction for six months. § 39.811(l)(a). If grounds for dependency have not been established, the court is required to dismiss the petition. § 39.811(l)(b).
In this case, the trial court determined that DCF proved the statutory grounds for termination in sections 39.806(1)(f) and (g) by clear and convincing evidence. The court also concluded that there was a nexus between the abuse of Z.C.(l) and the substantial risk of significant harm to Z.C.(2). But because it believed that a permanent guardianship was a potential placement option, the court concluded that DCF failed to prove termination was in the children’s manifest best interests or was the least restrictive means of protecting the children. The court therefore declined to terminate parental rights; instead, it adjudicated the children dependent and sua sponte entered an order placing them in a permanent guardianship with the maternal grandparents.
The parties do not dispute that DCF presented sufficient evidence of both egregious conduct and aggravated child abuse of Z.C.(l) under sections 39.806(l)(f) and (g) based on the serious injuries he suffered while in the parents’ care. See K.A. v. Dep’t of Children & Family Servs., 880 So.2d 705, 708 (Fla. 2d DCA 2004). And both sections 39.806(l)(f) and (g) provide a valid statutory ground for termination as to both children based on this abuse of Z.C.(l). DCF and GAL challenge the trial court’s application of the nexus test, the manifest best interests test, and the least restrictive means test. DCF and GAL also argue that the court erred by sua sponte considering and imposing a permanent guardianship at this stage in the proceedings. We address each of these issues in turn.
III. The trial court properly determined that there was a, nexus between the abuse of Z.C.(l) and the substantial risk of significant harm to Z.C.(2).
DCF and GAL argue that the trial coui't’s finding that DCF met its burden of proving the statutory grounds for termination in sections 39.806(l)(f) and (g) ends the inquiry into whether the parents’ conduct toward Z.C.(l) was sufficient to support termination of their parental rights to Z.C.(2). However, the supreme court has set forth an additional burden of proof in cases involving termination of parental *983 rights to a child based on abuse of a sibling. See Padgett, 577 So.2d at 571.
In Padgett, the supreme court addressed the question of whether a prior termination of parental rights based on the abuse and neglect of a sibling could support the subsequent termination of the parent’s rights to a child. Id. at 566. The court analyzed (1) whether statutory or other legal authority supported such a practice, and (2) whether the practice was constitutional. Id. at 568-71. In analyzing the first question, the court explained that the statute expressly provided for termination of parental rights based on the abuse or neglect of other children and that this was consistent with its legislative intent. Id. at 569-70.
In analyzing the second question, the Padgett court recognized a parent’s “longstanding and fundamental liberty interest” in parenting her children without government interference. Id. at 570. However, the court explained that this right was not absolute but would surrender to the children’s right to be free from physical and emotional violence at the hands of their caretaker. To protect the parent’s fundamental liberty interest, the court determined that DCF was required to “show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child.” Id. at 571. In addition, DCF must establish “that termination of those rights is the least restrictive means of protecting the child from serious harm.” Id.
Thus, contrary to DCF and GAL’s arguments, the trial court could not terminate the parental rights to Z.C.(2) based on the abuse of Z.C.(l) without first determining that reunification with the parents poses a substantial risk of significant harm to Z.C.(2). The Padgett court did not set forth a test for evaluating this requirement. However, the supreme court provided some guidance in a case addressing a similar issue regarding the propriety of adjudicating a child dependent based on the abuse of a sibling. See R.F. v. Dep’t of Children & Families, 770 So.2d 1189 (Fla.2000).
In R.F., the court reviewed a decision to affirm an adjudication of dependency of the child M.F.[3] based solely upon the fact that the father had been convicted of a sex offense against a sibling. Id. at 1191-92. This decision conflicted with the decisions of another district which required additional evidence to establish the likelihood that the parent would similarly abuse the children at issue.
The R.F. court noted that in Padgett it had held that a court could terminate parental rights based on the abuse or neglect of a sibling. Id. at 1193. And in Padgett the court had not based its ruling on one fact in particular but on “extensive and wide-ranging evidence of abuse and neglect.” Id. The R.F. court concluded that the per se rule was inconsistent with Pad-gett and with the language of the dependency statute requiring “proof that the parent poses a substantial risk of imminent abuse or neglect to the child’s sibling.” R.F., 770 So.2d at 1194. The court instead required that the trial court should focus on the totality of the circumstances. In cases involving prior sexual acts on a sibling, those circumstances would include “[a]ny similarity between the prior act and the pending case; the temporal proximity of the prior act to the pending case; any treatment received by the parent following the act; and the testimony (if appropriate) of professionals and experts.” Id. at 1194 n. 13.
*984 This language in R.F. was interpreted by the district courts to require a “nexus” between the abuse of a sibling and the prospect that the same type of abuse would be suffered by the children who were the subject of the dependency proceedings. See, e.g., C.M. v. Dep’t of Children & Families, 844 So.2d 765, 766 (Fla. 2d DCA 2003); C.W. v. Dep’t of Children & Family Servs., 944 So.2d 1197, 1198-99 (Fla. 3d DCA 2006); J.B., III v. Dep’t of Children & Families, 928 So.2d 392, 395 (Fla. 1st DCA 2006); M.N. v. Dep’t of Children & Families, 826 So.2d 445, 448 (Fla. 5th DCA 2002); O.S. v. Dep’t of Children & Families, 821 So.2d 1145, 1148 (Fla. 4th DCA 2002).
And this court applied the “nexus” language from dependency cases citing R.F. to explain Padgett’s requirement of “a substantial risk of significant harm” from the abuse or neglect of a sibling in termination of parental rights cases. See, e.g., K.A., 880 So.2d at 709; A.D. v. Dep’t of Children & Family Servs., 870 So.2d 235, 238 (Fla. 2d DCA 2004).
In K.A., this court concluded that DCF failed to present sufficient evidence of a substantial risk of significant harm to the parents’ older children based on the egregious abuse of their infant son. 880 So.2d at 709. The infant had been diagnosed with shaken baby syndrome based on fractures to his skull, femur, and ribs that had occurred on three separate occasions. Id. at 707. Although there was no evidence that the parents inflicted the injuries, the infant was almost always in the parents’ care. And there was expert medical testimony that the parents should have at least been aware of the injuries. This court concluded that DCF had established grounds for termination of the parental rights to the infant based on egregious conduct and affirmed the portion of the order on appeal terminating parental rights to that child. Id. at 708-09.
However, the two older children in K.A. had not suffered any abuse, and there was testimony that they had been cared for appropriately. Id. at 707-08. Additionally, the parents had very positive interactions with the older children during visitation. Id. at 708. In fact, the guardian ad litem opposed termination and recommended affording the parents a case plan with a goal of reunification.
In reversing the order terminating the parents’ rights to the older children on appeal, this court concluded that DCF failed to establish a “nexus or predictive relationship between the past abuse of the infant and any prospective abuse of the older children.” K.A., 880 So.2d at 709. This court applied R.F. ⅛ totality of the circumstances test as espoused in A.D., 870 So.2d 235. See K.A., 880 So.2d at 709. This court concluded:
The two older children have not been abandoned, abused, or neglected. By all accounts, they have been well cared for and are closely bonded to their parents. The parents do not suffer from any physical or mental illness or condition that would inhibit their proper care of these children in the future. Further, there is no indication these children were aware of the abuse or present when it occurred or that it had any psychological impact upon them. Under these circumstances, the trial court’s conclusion that the termination of the parents’ rights to the two older children was the least restrictive means of protecting them was not supported by clear and convincing evidence and was clearly erroneous.
Id. at 709-10.
Very shortly after K.A. was decided, the supreme court held that the totality of the circumstances standard as applied in R.F. *985 (cited to as In re M.F.) should be used to evaluate whether DCF met Padgett’s requirement of proving “a substantial risk of significant harm” from the abuse or neglect of a sibling in termination proceedings. F.L., 880 So.2d at 608. The supreme court explained that the totality of the circumstances analysis should emphasize the facts regarding the prior involuntary termination as follows:
Specifically, if the parent’s conduct that led to the involuntary termination involved egregious abuse or neglect of another child, this will tend to indicate a greater risk of harm to the current child. The amount of time that has passed since the prior involuntary termination will also be relevant. A very recent involuntary termination will tend to indicate a greater current risk. Finally, evidence of any change in circumstances since the prior involuntary termination will obviously be significant to a determination of risk to a current child. While a parent’s past conduct necessarily has some predictive value as to that parent’s likely future conduct, positive life changes can overcome a negative history.
Id. at 610.
DCF argues that the nexus test applied by this court is something different than the totality of the circumstances test the supreme court discussed in F.L. DCF points to the following language this court has repeatedly quoted and applied to determine what evidence would satisfy the nexus test: “ ‘Generally, this nexus is established when the parent has a mental or emotional condition that will continue, such as mental illness, drug addiction, or pedophilia, and which will make it highly probable that in the future the parent will abuse or neglect another child.’ ” A.D., 870 So.2d at 238 (quoting C.M., 844 So.2d at 766); see also T.L. v. Dep’t of Children & Family Servs., 990 So.2d 1267, 1272 (Fla. 2d DCA 2008); M.C. v. Dep’t of Children & Family Servs., 940 So.2d 571, 575 (Fla. 2d DCA 2006); G.R. v. Dep’t of Children & Family Servs., 937 So.2d 1257, 1262-63 (Fla. 2d DCA 2006); M.C. v. Dep’t of Children & Family Servs., 936 So.2d 764, 766 (Fla. 2d DCA 2006).
While this language suggests that certain evidence would satisfy the nexus test in dependency and termination cases, these cases do not require this specific type of evidence to meet the nexus test. In C.M., for example, this court relied on the absence of such evidence to reverse an adjudication of dependency as to a father’s biological children based primarily on an incident in which he struck his teenage stepdaughter during an argument. 844 So.2d at 765-67. However, the court did not reject the application of other circumstances in favor of such scientific evidence. There was simply insufficient evidence of any circumstances that established a substantial certainty that the father would similarly abuse his biological children.
In T.L., this court similarly relied on the absence of evidence to reverse an order terminating parental rights to the father’s child based on egregious abuse of a sibling. 990 So.2d at 1272-73. The trial court had concluded that the injuries to the sibling established that the father was “ ‘a perpetrator who was undeterred, unfeeling, very impulsive, and very likely possessing an explosive temper’ and who was ‘capable of harming any child under his or her care and control, including his or her very own flesh and blood.’ ” Id. at 1272. However, this court found that those findings were refuted by DCF’s expert psychologist’s testimony that the sibling’s injuries did not indicate that the father lacked self-control. “In addition, DCF failed to present any evidence at trial that the Father suffered from a mental illness, drug addiction, pe *986 dophilia, or some other mental or emotional condition that would make it likely that he would abuse or neglect his son.” Id. at 1270.
These cases mention factors that are consistent with the supreme court’s suggestion in R.F. that the court consider “any treatment received by the parent following the act; and the testimony (if appropriate) of professionals and experts” as part of the totality of the circumstances. R.F., 770 So.2d at 1194 n. 13. And these cases do not limit the nexus test to circumstances where “'the parent has a mental or emotional condition that will continue, such as mental illness, drug addiction, or pedophilia.’ ” See A.D., 870 So.2d at 238 (quoting C.M., 844 So.2d at 766). Instead, these cases merely suggest circumstances that might be considered as part of the totality of the circumstances to satisfy the nexus test. We conclude that this court’s use of the term “nexus” is therefore consistent with the totality of the circumstances test described by the supreme court in F.L.
That leaves the question of whether the trial court in this case properly applied the totality of the circumstances test to resolve the nexus issue. The trial court made the following findings regarding the nexus between the abuse of Z.C.(l) and the substantial risk of significant harm to Z.C.(2):
The nexus in this case is the parents’ mutual commitment to lying and covering up the abuse of a child whose sibling can, at any time, be equally susceptible to the kind of aggravated child abuse proven against his twin brother, given the fact they are identically situated and aged siblings. After all, while [Z.C.(l) ] had the “more noteworthy and persistent cry” there is nothing to say that his presently uninjured twin, [Z.C.(2) ], might be the child who takes upon [sic] that mantle in the future. Indeed, these children are aging concurrently, and the challenges of parenting that come with one infant/toddler, when magnified by two, are surely more pronounced.
In addition to the mutual cover up and lies, it is clear that both parents prioritize each others’ relationship over the better interests of their infants, and given their demonstrated predilection to do this to [Z.C.(l) ], who suffered such egregious injuries, the Court must only conclude that [Z.C.(2) ], fortunate enough to be uninjured at present, might nonetheless in future take a seat behind the “prioritized interests” of one or both his parents. And that, in and of itself, is a nexus of behavior that jeopardizes the safety of [Z.C.(2) ] and is not in the better interests of [Z.C.(2) ].
These findings properly focused on the egregious abuse of Z.C.(l) and the factual circumstances of that abuse. And the court properly considered the applicability of these factual circumstances to Z.C.(2) based on the temporal proximity of the abuse, Z.C.(2)’s status as a twin, and the parents’ continued prioritization of each other over the safety and well-being of Z.C.(l). See F.L., 880 So.2d at 610; R.F., 770 So.2d at 1194 n. 13. Because the evidence supports the trial court’s findings, the trial court properly determined that there was a nexus between the abuse of Z.C.(l) and the substantial risk of significant harm to Z.C.(2).
IV. The trial court erred in concluding that DCF failed to prove termination would be in the children’s manifest best interests.
Section 39.810 sets forth eleven non-exhaustive factors courts should consider in determining whether termination is in the manifest best interests of the children. One of these factors is “[a]ny *987 suitable permanent custody arrangement with a relative of the child.” § 39.810(1). But “the availability of a nonadoptive placement with a relative may not receive greater consideration than any other factor weighing on the manifest best interest of the child and may not be considered as a factor weighing against termination of parental rights.” Id.
The trial court’s order makes detailed findings regarding each of the eleven manifest best interest factors set forth in section 39.810. The court concluded that the parents have developed bonds with the children but those bonds were no closer than the children’s bonds with the maternal grandparents. The court determined that the parents lacked the capacity to care for the children based on the egregious abuse one or both of them inflicted on Z.C.(l) and their failure to protect the infant from that abuse. The court was also seriously concerned with the parents’ denial of the abuse and scheme of lying to protect each other from any legal consequences of that abuse. And the court noted that the guardian recommended termination.
Despite the fact that these factors clearly weighed in favor of a finding that termination was in the children’s manifest best interests, the court concluded otherwise. The court explained its rationale as follows:
The Court therefore considered the provisions of sections 39.810(1)-(11), Florida Statutes (“Manifest Best Interests of the Child”) and makes the finding that it is not in the manifest best interests of the children that parental rights be fully terminated; rather, it is both the lesser restrictive alternative and in the better interests of the children that the babies be placed, together, into permanent guardianship with the maternal grandparents and be permitted to maintain regular visitation with both parents.
By basing its decision not to terminate solely on the availability of a permanent guardianship with the maternal grandparents, the trial court violated the express prohibition in section 39.810(1) against giving the availability of a nonadoptive placement greater consideration than any other best interest factor. The court therefore erred in concluding that DCF failed to prove termination would be in the children’s manifest best interests. See Guardian Ad Litem Program v. T.R., 987 So.2d 1269, 1271 (Fla. 1st DCA 2008) (“ ‘[T]he possibility of a relative placement is plainly not a reason to delay a decision to terminate parental rights if termination is otherwise in the manifest best interest of the child.’ ”) (quoting K.W. v. Dep’t of Children & Families, 959 So.2d 401, 402 (Fla. 1st DCA 2007)).
V. The trial court erred in concluding that DCF failed to prove termination was the least restrictive means of protecting the children.
The next question is whether trial court misapplied the least restrictive means test as set forth in Padgett to the facts of this case. In Padgett, the court described the least restrictive means test as “ordinarily” requiring DCF to “show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child.” 577 So.2d at 571. In In re T.M., the supreme court subsequently explained that Pad-gett's least restrictive means test does not require a performance agreement in cases of egregious abuse because under those “extraordinary circumstances ... the termination of parental rights without the use of plans or agreements is the least restrictive means.” In re T.M., 641 So.2d 410, *988 413 (FIa.1994). We do not read this language to obviate the application of the least restrictive means test as suggested by the special concurrence. The T.M. court did not decline to apply the least restrictive means test; it detennined that the test was met by the circumstances of the case.
Moreover, the supreme court has made clear that it finds the least restrictive means test to be implicit in Florida’s statutory scheme based on the court’s obligation to apply a constitutional construction to the statutes. See F.L., 880 So.2d at 609. In F.L., the supreme court reversed the Fourth District’s decision declaring section 39.806(l)(i), Florida Statutes (2001),[4] unconstitutional on the basis that it omitted Padgett’s requirement that DCF prove that reunification posed a substantial risk of significant harm. 880 So.2d at 607; F.L. v. Dep’t of Children & Families, 849 So.2d 1114, 1122-23 (Fla. 4th DCA 2003). The Fourth District had relied on the Fifth District’s interpretation of the statute to allow a parent to present evidence that the circumstances surrounding the abuse of a sibling cannot serve as a predictor of the parent’s conduct with the current child. F.L., 849 So.2d at 1123 (quoting A.B. v. Dep’t of Children & Families, 816 So.2d 684, 685 (Fla. 5th DCA 2002)). The Fourth District ruled that this interpretation impermissibly shifted the burden of proof to the parent in contravention of Padgett. Id. at 1124.
The supreme court upheld the constitutionality of the statute based on its construction of the statute as not shifting the burden of proof to the parent. F.L., 880 So.2d at 609. The court explained that Padgett’s constitutional requirements apply to all cases involving the involuntary termination of a parent’s rights absent an express determination to the contrary by the legislature. And “to be constitutional under Padgett, the statute must be interpreted as requiring [DCF] to also prove that reunification would be a substantial risk to the child and that termination is the least restrictive way to protect the child.” Id. (Emphasis added.)
In this case, we conclude that the trial court misapplied the least restrictive means test. As was stated previously, under T.M., the termination of parental rights without the use of plans or agreements is the least restrictive means of protecting a child from serious harm in cases of egregious abuse. 641 So.2d at 413. Furthermore, “[t]he existence of possible placement with a relative is irrelevant to the least restrictive means test.” N.S. v. Dep’t of Children & Families, 36 So.3d 776, 779 (Fla. 3d DCA 2010); see also S.S. v. Dep’t of Children & Family Servs., 891 So.2d 1068, 1070 (Fla. 2d DCA 2004) (holding that the trial court properly rejected the parent’s argument that a long-term relative placement was the least restrictive means of protecting the child); R.L. v. Dep’t of Children & Families, 955 So.2d 1240 (Fla. 5th DCA 2007) (“[T]he existence of a long-term relative placement is not the ‘dispositive constitutional consideration’ in applying the least-restrictive means test.”) (quoting A.J. v. K.A.O., 951 So.2d 30 (Fla. 5th DCA 2007)). Thus, the trial court erred in concluding that, because a permanent guardianship was a placement option, DCF failed to prove termination was the least restrictive means of protecting the children.
VI. The trial court was precluded as a matter of law from placing the chil *989 dren into a permanent guardianship at this stage in the proceedings.
Even if the trial court had correctly applied the least restrictive means and manifest best interests tests, it was precluded as a matter of law from placing the children into a permanent guardianship at this stage in the proceedings. The court’s powers of disposition after an adjudicatory hearing on a petition for termination of parental rights are limited by section 39.811(1). Under section 39.811(l)(a) the trial court would have been permitted to adjudicate the children dependent if grounds for dependency had been established. However, it would have been required to either (1) continue the children in their out-of-home placement with a case plan, or (2) return the children to the parents and retain jurisdiction for six months. See § 39.811(l)(a).
Instead of ordering one of these authorized dispositions, the trial court ordered a disposition that was not requested in the pleadings before it or supported by the evidence presented at the adjudicatory hearing. The case plan filed by DCF contained a permanency goal of adoption, and the parties did not agree to litigate the issue of any alternative permanency placement at the adjudicatory hearing. Thus, the trial court’s order placing the children in a permanent guardianship had the effect of modifying the case plan without affording proper notice or the opportunity to be heard. See K.E. v. Dep’t of Children & Families, 958 So.2d 968, 972 (Fla. 5th DCA 2007) (holding that the trial court’s order granting the father’s motion for sole custody and to terminate jurisdiction had the effect of erroneously modifying the mother’s case plan without proper notice and the opportunity for an evidentiary hearing).
VII. Conclusion.
In conclusion, the trial court erred in denying DCF’s petition to terminate parental rights to both children based on the egregious conduct toward and aggravated child abuse of Z.C.(l). The court properly determined that DCF presented clear and convincing evidence of both egregious conduct toward and aggravated child abuse of Z.C.(l) under sections 39.806(l)(f) and (g). Additionally, the court properly determined that there was a nexus between the abuse of Z.C.(l) and the substantial risk of significant harm to Z.C.(2). However, the court misapplied the manifest best interests and least restrictive means tests by basing its decision not to terminate solely on the availability of the alternative placement. And the court erred in sua sponte placing the children into a permanent guardianship at this stage in the proceedings. We therefore reverse both orders on appeal and remand with directions for the trial court to reconsider DCF’s termination petition by reapplying the manifest best interest and least restrictive means tests as described above.
Reversed and remanded.
NORTHCUTT, CASANUEVA, DAVIS, VILLANTI, WALLACE, KHOUZAM, and CRENSHAW, JJ., Concur.
ALTENBERND, J., Concurs specially with an opinion in which WHATLEY, KELLY, LaROSE, MORRIS, and BLACK, JJ„ Concur.

. In case numbers 2D10-3543 and 2D10-3545, the parents also filed notices of appeal from the trial court's orders. Those appeals were subsequently consolidated with the appeal in this case. However, counsel for the parents asserted there were no issues of merit in the parents' appeals and moved to withdraw. This court granted the parents' attorneys' motions to withdraw as counsel for purposes of those appeals. The parents thereafter declined to submit merits briefs in those appeals, and cases 2D10-3543 and 2D 10-3545 were dismissed for failure to prosecute.

. Chapter 39 also requires DCF to prove that the parents of the child were informed of their right to counsel and that the court entered a dispositional order adjudicating the child dependent in any prior dependency proceeding. § 39.802(4)(b). Because DCF filed an expedited petition for termination of parental rights, it was not required to prove that a dispositional order adjudicating the children dependent had been ordered under section 39.802(4)(b). See §§ 39.802(5), 39.806(3).

. This case is also cited as In re M.F., 770 So.2d 1189 (Fla.2000).

. Section 39.806(1)0 provides for termination of parental rights “[w]hen the parental rights of the parent to a sibling have been terminated involuntarily.” It was enacted after Padgett was decided. See Ch. 98-403, § 88, at 3205, Laws of Fla.