974 So.2d 495 (2008)
C.D., the Mother of B.G., C.D. and A.D., each a Child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 1D06-6397.
District Court of Appeal of Florida, First District.
January 31, 2008.
*496 Patricia L. Parker of Parker & Du-Fresne, P.A., Jacksonville, for Appellant.
Anthony C. Musto, Hallandale Beach, for Appellee.

ON MOTION FOR REHEARING OR CLARIFICATION
LEWIS, J.
We deny the Department's motion for rehearing or clarification. On our own motion, we withdraw our previous opinion and substitute the following.
C.D., the mother of B.G., C.D., and A.D., seeks review of the trial court's Order on Judicial Review Permanency Hearing and Termination of Supervision.[1] This order placed the children in permanent guardianship and denied the mother's then pending Petition for Reunification, stating that although the mother had substantially complied with her case plan, reunification was not in the children's best interests.[2] The mother argues the trial court failed to list adequate factual findings and that *497 there was not competent substantial evidence to justify denying her request for reunification. We agree with both contentions, and accordingly, we reverse.
The mother has an extensive history of alcohol and drug abuse, psychological problems, and experiences involving domestic violence. In 2002, when the mother was Baker Acted in the State of Ohio, B.G. and C.D. were removed from her care. Later, the mother underwent a psychological evaluation, which revealed she had experienced a "substance-induced psychotic disorder" but that her alcohol and cannabis dependence was in "early full remission," The evaluation ruled out "schizoaffective disorder/bipolar type" as a diagnosis. After the mother successfully completed her case plan in Ohio, B.G. and C.D. were returned to her care.
Approximately one year and four months later, the Florida Department of Children and Families (the Department) removed the children again, along with their younger sibling, A.D.[3] At that time, B.G. was twelve years old, C.D. was four years old, and A.D. was twenty months old. The Department filed shelter petitions, alleging the mother had been Baker-Acted again, that her home was in "deplorable conditions" with unsanitary sleeping arrangements, "what could be found" of the children's clothing was "filthy," and there were several animals in the home and animal food "all over the floor." The children were sheltered, and the Department filed a Petition for Dependency. The dependency petition contained the same allegations as the shelter petitions, as well as details of a domestic violence situation between the mother and her paramour. The trial court adjudicated the children dependent and approved a case plan that had a goal of reunification. The goal was later changed to long-term relative care, although in every relevant order, the trial court found the mother was either partially or substantially compliant with her case plan.
Throughout the case, the Department and the guardian ad litem expressed concerns about the mother's mental health. The Department maintained that the mother had been diagnosed with "bipolar disorder, schizophrenia, and psychosis," although the record contains no documentation of these diagnoses from any licensed mental health professional. Early in the case, the mother underwent a Parental Fitness Evaluation by Dr. Philip Yates, a psychologist. At that time, Dr. Yates expressed an unfavorable opinion about the mother's fitness as a parent. He recommended long-term psychotherapy as well as a psychiatric consultation for medication. Dr. Yates questioned whether the mother would be willing to participate in therapy, but he believed she could benefit from it. He recommended against unsupervised visitation with the children and suggested that the mother be re-evaluated after undergoing therapeutic treatment. Approximately one year after Dr. Yates' initial evaluation of the mother, the Department quoted him as saying the mother was "doing extremely well" in therapy.
After living apart from her mother for almost a year, B.G. wrote a letter to the caseworker, expressing her feelings about the situation. The letter revealed that B.G. did not want to live with her mother because she remembered having to "move around" and change schools often when she was in her mother's care. She recalled that "[Mere were times when there was no food in the house," and stated that she wanted "to live with a family who *498 doesn't spend all their money on drugs and alcohol." She was troubled by her mother's past relationships with men because she remembered "a lot of fighting" and observed that her mother had often. "mov[ed] from one relationship to the next." B.G. also resented that her mother had broken promises to her.
Due to their ages, C.D. and A.D. did not express opinions regarding the desirability of reunification. However, the staff at the family visitation center in Ohio, where the mother had been visiting C.D. and A.D., made positive observations regarding the mother's interaction with them.[4] At the same time, notes from the family visitation center indicated that while the children were happy to see their mother when she arrived, they were not upset when she departed.
In the guardian ad litem's final report to the court, she indicated that the fact that the children were not emotionally distressed when visits with the mother ended was significant. Additionally, she maintained her position that the mother's mental health problems made reunification inappropriate, identifying three facts to support this position: (1) that the mother had bought an excessive amount of furniture and clothing for her children in anticipation of their return; (2) that the mother had two dogs in the house, one that belonged to her and one that she was keeping for a friend; and (3) that the mother had made excuses for her several hospitalizations. The guardian ad litem opined that the mother's excessive spending indicated she may have been experiencing a manic state of bipolar disorder. The presence of the dogs reminded the guardian ad litem of the fact that the mother had spent too much money on dogs and birds when the children came into state custody. She felt that the dogs' presence indicated that the mother had difficulty prioritizing. The guardian ad litem stated that the mother's excuses for her hospitalization indicated that she had an "inability to deal with reality."
Nonetheless, the therapist and psychologist who had remained involved in the case had begun to express more confidence in the mother's ability to maintain stable mental health. Dr. Yates specifically disapproved of the guardian ad litem's characterization of the mother's behavior as a continuation of a manic state. He identified positive aspects of the mother's decisions to purchase furniture and clothing for her children and to care for a friend's dog while the friend was on vacation. Dr. Yates believed that the younger children's failure to show distress when visits with the mother ended could indicate that they had accepted the situation, and not that they had "some pathological lack of attachment" to her. Regarding the allegations that Appellant had bipolar disorder, Dr. Yates said,
[M]y testing has failed to indicate the presence of a Bipolar Disorder. I have been assessing [Appellant] on this specific dimension for over a year . . . and still have not found the presence of that disorder. While it is true that bipolar episodes can occur with a frequency of once every four to ten years, it is also a commonly accepted practice among trained mental health professionals . . . to take a year of continuing observation assessment of an individual before a full diagnosis of a Bipolar Disorder is made.
Dr. Yates further opined that the guardian ad litem's conclusions were "over defined" *499 and did not reflect a "proper and realistic appreciation" of the mother's efforts. He concluded the mother was "functioning at a stable emotional state," and he did not believe she posed a danger to the children. He further stated that "[t]here [were] absolutely no indications that she is prone to destabilize" and that tests he had administered revealed no signs of "vulnerability for acts of child physical abuse." Likewise, Lisa Angel, a therapist from the Child Guidance Center, indicated that the mother had "reached all of her goals in therapy," and further stated, "I see no reason for [the mother] to not be able to have at a minimum visitation with her children." She noted that the mother had matured and learned to accept the circumstances involving B.G.'s desire not to see her.
Still, at the final permanency hearing, the caseworker and the guardian ad litem maintained their previous positions. Both opined that reunification was not in the children's best interests. They felt strongly that the mother's troubled history, combined with the fact that she had previously been reunified with her children, only to have them removed again, established a pattern that would be repeated in this case if the trial court ordered reunification. The guardian ad litem further testified that the mother resorted to drugs and alcohol to deal with stress. It is not clear from the transcript whether she was referring to recent events or problems the mother experienced prior to the initiation of the Florida dependency case, but there is no suggestion in the record of any such events that post-dated the Florida removal. The caseworker testified that B.G.'s therapist did not recommend contact with the mother. Ultimately, the children were placed in permanent guardianship, and the Department's protective supervision was terminated, on the basis of the magistrate's finding that although the mother had substantially complied with her case plan, reunification was not in the children's best interests.
Initially, we note that the primary purpose of Florida's dependency system is to protect the health and safety of children. See § 39.001(1)(b)1, Fla. Stat. (2006). When setting up procedures for accomplishing this purpose, the Legislature officially recognized "that most families desire to be competent caregivers and providers for their children and that children achieve their greatest potential when families are able to support and nurture the growth and development of their children." § 39.001(1)(b). As such, a basic principle of the dependency system is that the Department should, whenever possible, help families remedy their problems and be reunited. See, e.g., § 39.001(1)(b)3. In some cases, the circumstances giving rise to a child's dependency are so egregious that the Department is not required to offer services before seeking termination of parental rights. See § 39.806(2), Fla. Stat. (2006). In all other cases, the Department must develop case plans tailored to address the needs of the family through the provision of services and requirements that the parents accomplish specified tasks. See § 39.6011-.6012, Fla. Stat. (2006).
As this Court explained in T.F. v. Department of Children & Family Services, 881 So.2d 702, 702 (Fla. 1st DCA 2004), "[w]here, as here, a parent seeks reunification with a child, the child must be returned, to his or her parent if the parent has substantially complied with the case plan and `if the court is satisfied that reunification will not be detrimental to the child's safety, well-being, and physical, mental, and emotional health.'" (quoting B.D.E. v. Dep't of Children & Family Services, 829 So.2d 359, 360 (Fla. 1st DCA *500 2002)). Similarly, section 39.522(2), Florida Statutes (2006), requires the trial court to "determine whether the parent has substantially complied with the . . . case plan to the extent that the safety, well-being, and physical, mental, and emotional health of the child is not endangered by the return of the child to the home." Thus, under these authorities, there are at least two factors that a trial court must consider when ruling on a motion for reunification: the parent's compliance with the case plan and whether reunification would be detrimental to the children. As the statute suggests, when a parent has requested reunification and substantially complied with her case plan, there is a presumption that the children should be returned.[5] This presumption may be overcome by a finding that returning the children would endanger them.
When a trial court rules on a motion for reunification, it must demonstrate thorough consideration of the two factors required under section 39.522(2) by specifically addressing six sub-factors:
(a) The compliance or noncompliance of the parent with the case plan;
(b) The circumstances which caused the' child's dependency and whether those circumstances have been resolved;
(c) The stability and longevity of the child's placement;
(d) The preferences of the child, if the child is of sufficient age and understanding to express a preference;
(e) The recommendation of the current custodian; and
(f) The recommendation of the guardian ad litem
§ 39.621(10), Fla. Stat. (2006). A finding regarding each of these factors is mandatory and vital to a proper order denying reunification. In particular, the requirement to address "[t]he circumstances which caused the child's dependency and whether those circumstances have been resolved" indicates that a denial based solely on issues existing at the time a dependency case was initiated, without regard to the parent's progress as overcoming those issues, is improper.
If a trial court could properly base its decision concerning reunification solely on issues existing at the time the dependency case was initiated, section 39.621(10)(b) and all of the provisions regarding case plan development and compliance would be meaningless. If the trial court affords the parent an opportunity to follow a case plan, it stands to reason that it must consider whether the parent has benefited from those services such that the family can be safely reunited before denying a request for reunification. Such consideration is necessary if the trial court is to give effect to the legislatively mandated goal of remedying families' problems to achieve safe reunification.
In this case, the trial court failed to follow the mandatory language of section 39.621(10). Instead of documenting detailed *501 factual findings with regard to each of the six factors, the trial court made the conclusory finding that reunification was not in the children's best interests. In In re H.H., 865 So.2d 634, 635-36 (Fla. 2d DCA 2004), the Second District rejected similarly conclusory findings. There, the trial court's findings were not sufficient to show that reunification would endanger the children's safety, well-being, and health, where the order stated that "reunification was `contrary to the welfare of the children because the home situation presents a substantial and immediate danger to the children' and that `there is continued need for out-of-home placement to ensure the child[ren]'s health, safety and wellbeing.'" The trial court's finding in the instant case is even less specific, and like the findings in H.H., fails to reflect the level of consideration required making the complex and sensitive determination of whether children should be reunited with a parent.
If the failure to apply the correct law and enter particularized factual findings were the trial court's only error, we would reverse the order and remand for application of the correct law and entry of appropriate factual findings. See T.S. v. Dep't of Health & Rehabilitative Servs., 471 So.2d 543, 544 (Fla. 1st DCA 1985). However, in this case, the mother has correctly argued that the denial of her motion for reunification was not supported by competent substantial evidence. In other words, the order in this case is not merely procedurally flawed, as in Fitzpatrick v. State, Department of Health & Rehabilitative Services, 515 So.2d 319 (Fla. 3d DCA 1987) (remanding for entry of factual findings where the evidence presented to the trial court was conflicting), but it is also substantively flawed, as in In re G.D.H. and A.J.S., 498 So.2d 676 (Fla. 1st DCA 1986) (reversing an adjudication of dependency. where the trial court failed to list adequate factual findings and the record did not support a finding of dependency). See also In re C.S., 503 So.2d 417, 419 (Fla. 1st DCA 1987) (reversing an adjudication of dependency where "[e]ven if the order was not facially deficient, the adjudication . . . could not stand because the allegations of the petition are insufficient and the evidence adduced in support thereof" was legally insufficient). We emphasize that ordinarily a trial court's failure to list adequate factual findings can be remedied by instructions to the trial court to enter those findings. But it is clear from the record in this case that even if the trial court had addressed the required factors, a denial of the mother's request for reunification would still constitute reversible error.
Specifically, there is no competent substantial evidence in the record to support a determination that, at the time of the permanency hearing, reunification would have endangered the children's safety, well-being, and health. See T.F. v. Dep't of Children & Family Servs., 881 So.2d 702, 703 (Fla. 1st DCA 2004) (setting forth the standard of review). Competent substantial evidence has been defined as follows:
Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. . . . We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the "substantial" evidence should also be "competent."
Perdue v. TJ Palm Assocs., Ltd., 755 So.2d 660, 665 (Fla. 4th DCA 1999) (quoting *502 DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957)) (citations omitted). It has also been observed that competent substantial evidence is "tantamount to legally sufficient evidence." In re M.F., 770 So.2d 1189, 1192 (Fla.2000). Thus, whether evidence in a particular case is competent and substantial depends both on the nature of the evidence and its relationship to the applicable legal standards. With regard to the nature of the evidence, the standard of review is low: the nature has to be such that a "reasonable mind would accept fit] as adequate to support a conclusion." See Perdue, 755 So.2d at 665 (citations omitted). In the instant case, the evidence was insufficient to support the trial court's ultimate determination. Any evidence that established a substantial basis for an inference that the mother posed a detriment to the children was not material to the legally relevant time period.
The evidence presented at the permanency hearing in opposition to reunification with A.D. and C.D. consisted of the following: the caseworker's opinion; the guardian ad litem's opinion; an observation that, while the children were happy when their mother visited, they were not upset when she departed; the fact that the children were removed after reunification once before; and the fact that the mother had a history of drug and alcohol abuse and psychological problems. Additional evidence presented in opposition to reunification with B.G. consisted of reports that she did not want to see her mother and that her therapist recommended against contact with her mother. The vast majority of this evidence is focused on problems that existed prior to the initiation of the Florida dependency case, and the remainder of the evidence cannot be reasonably linked to any danger to the children's safety, well-being, or physical, mental, or emotional health.
The opinions expressed by the caseworker and the guardian ad litem were based largely on concerns that the mother would repeat the mistakes she made after regaining custody of her children in Ohio. They recognized that the mother was stable when the children were not in her custody, but predicted that she would mentally deteriorate if the children were returned. Because the children had not been returned to the mother since the initiation of this case, these predictions were untested assertions based on one previous occurrence. As such, there was no factual basis to support the opinions that the mother had established a pattern of mental deterioration after regaining stability through the dependency system. While the trial court is permitted, and indeed required, to consider the opinions of the caseworker and guardian ad litem, it cannot base its decision on unsupported assertions. See Norris v. Norris, 926 So.2d 485, 488 (Fla. 2d DCA 2006) (holding that a "conclusory opinion unsupported by a factual basis" was not competent substantial evidence). Such hollow assertions do not establish a reasonable basis for a conclusion that the mother posed a detriment to the children. To the extent the opinions were supported by identifiable facts, the facts related only to conditions existing at the initiation of the case, and which the case plan was designed to remedy.
Notably, even the concerns expressed by B.G. relate only to her experience prior to the initiation of the Florida dependency case. B.G. had not seen her mother since that time. While it is possible that B.G. was still suffering mental or emotional difficulties resulting from her past experiences with her mother, the Department produced no evidence of any such difficulties beyond the conclusory report regarding the opinion of B.G.'s therapist. The report that, at some point, B.G.'s therapist *503 stated that it was not in her best interests to see her mother does not provide a substantial basis for a conclusion that on the date of the hearing, the mother posed a detriment to B.G.
If the trial court based its decision on Dr. Yates' initial evaluation, as discussed in the reports leading to the final permanency hearing, this basis was insufficient. Dr. Yates' initial evaluation of the mother took place in the very early stages of her case. His opinion, as of the date of the hearing, indicated that the mother had benefited from her experience in the dependency system and stated that she had responded well to therapy. Dr. Yates essentially explained that his prior evaluation did not carry the significance the Department had attached to it. Thus, standing alone, Dr. Yates' opinion does not form competent substantial evidence to support a denial of reunification. Cf. In re B.C., 936 So.2d 764, 767 (Fla. 2d DCA 2006) (finding a lack of competent substantial evidence to support the trial court's conclusion that a father was likely to sexually abuse his son where the trial court relied entirely on testimony from an expert who discussed recidivism in pedophiles but further opined that the father was not likely to abuse his son).
Finally, we cannot discern how the suggestion that A.D. and C.D. were not sad when they departed from their mother led the trial court to conclude that reunification would endanger the children's health, safety, and well-being. Although this suggestion represents one of the few concrete facts relating to the time period leading up to the permanency hearing, it reveals little or nothing about whether the children would have been harmed by reunification.
Neither the evidence discussed at the permanency hearing, nor any other evidence in the record, indicates that reunification would have endangered the children. Thus, the trial court's denial of the mother's petition for reunification was not supported by competent substantial evidence. Specifically, we hold that a trial court may not refuse to reunify children with a parent without finding, based on factors existing at the time of the request, that doing so would endanger their safety, well-being, and physical, mental and emotional health. See § 39.522(2). The Department was aware that the mother's petition was under consideration at the time of the permanency hearing, and it failed to produce legally sufficient evidence to prevent reunification. As discussed above, it would be unnecessary and inefficient to request the trial court to enter factual findings in support of a legal conclusion that is unsupported by the record. See In re A.T. & T.T., 490 So.2d 155, 156 (Fla. 1st DCA 1986) (noting the need for efficiency in child dependency cases "in order to provide a stable emotional environment for the children").
Accordingly, we REVERSE and REMAND for reunification of the children with the mother and reinstatement of the Department's supervision. See T.F., 881 So.2d at 703; Fla. R. Juv. P. 8.415(f)(5) (2006).
No further motions for rehearing will be entertained. The Clerk is directed to issue the mandate forthwith.
DAVIS and ROBERTS, JJ., concur.
NOTES
[1] This order adopted, the magistrate's report and recommendations following a permanency hearing. It was initially entered on August 9, 2006. In issuing this order on August 9, 2006, the trial court neglected to rule on the mother's timely filed exceptions to the magistrate's report and recommendations. Subsequently, the trial court held a hearing on the mother's exceptions and, on November 7, 2006, issued an order overruling them. On December 6, 2006, the mother filed a notice of appeal as to the November 7th order, stating as a basis for appeal that the order affirmed the previous Order on Judicial Review Permanency Hearing and Termination of Supervision. On December 29, 2006, the trial court issued an Order Correcting Record, acknowledging that the August 9th order was entered in error, and re-entering the Order on Judicial Review Permanency Hearing and Termination of Supervision, nunc pro tune to November 7, 2006. Based on the trial court's correction of the record, the mother's appeal is timely, and she seeks review of an appealable order.
[2] Although the order did not explicitly state that the mother's Petition for Reunification was denied, the statement that reunification was not in the children's best interests, along with the placement of the children into permanent guardianship and the termination of protective supervision, was a functional denial of the petition. The magistrate acknowledged the petition at the permanency hearing, and the issue was discussed at length.
[3] A.D. was born in April 2003, after the Ohio case was initiated but before B.G. and C.D. were reunified with the mother in August 2003.
[4] The mother was not permitted to visit B.G., apparently because B.G. did not want to see her and because of reports that B.G.'s therapist believed contact with the mother was not in B.G.'s best interests.
[5] In this case, the goal of the case plan was long-term relative care. However, this goal does not affect the analysis for several reasons. First, section 39.522(2) does not differentiate between case plans with the goal of reunification and those for which the goal is long-term relative care. Presumably, the goal is less important when a parent has requested reunification than when the Department seeks to terminate protective supervision. Second, the tasks associated with the long-term relalive placement goal in this case are no different from those that were associated with the goal of reunification. Third, the trial court is required to consider at each permanency hearing whether the goal of the case plan remains appropriate. See § 39.621(4)(a). Finally, the Department has not argued that section 39.522(2) should be evaluated by different standards according to the goal of the relevant case plan.