971 So.2d 274 (2008)
T.M.; and L.A., Appellants,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, STATE OF FLORIDA, Appellee.
Nos. 4D07-1938, 4D07-1939.
District Court of Appeal of Florida, Fourth District.
January 8, 2008.
*275 Gary L. Pickett, West Palm Beach, for appellant father.
John Brewer, Lake Worth, for appellant mother.
Jeffrey Dana Gillen, West Palm Beach, for appellee.

CORRECTED OPINION
FARMER, J.
In this termination of parental rights appeal, the mother argues that her continued association with the child's violent father should not legally support a finding of a reasonable risk that the baby will be harmed again. She argues that the tenor of the trial judge's order terminating her rights is to punish her for continuing to associate with him, and for her lack of candor on the subject. She points out that she had completed all the tasks in her case plan imposed in regard to an older child in an earlier case.
Before the baby in question was born, the mother had been receiving services from the Department of Children and Families (DCF) on account of the dependency of an older child by a different father. The father in this case had violently disciplined this older child. In the case relating to the older child, the mother's parental rights were not terminated but the child was determined to be dependent and placed outside the mother's care.
M.M., the baby involved in this case, was born 3 May 2006. On June 29th, nearly two months after the birth, there was an incident of domestic violence by the baby's father. The mother reported that the father had "punched [her] on the left side of her head four times. [She] was holding [M.M.] in her left arm, and the father grabbed her by the right arm causing puncture wounds from his long nails." She said that it did not hurt because she was somewhat of a "tomboy." A DCF caseworker began an investigation. M.M. was placed under protective supervision. The mother agreed to seek a domestic violence injunction against the father.
On 7 August 2006, while still under protective supervision, the mother presented M.M at the emergency room with symptoms of a fever and a swollen leg. The doctors discovered that the baby's left femur was fractured. According to hospital staff, the mother was initially unable to explain how the injury occurred. Eventually she stated that his leg was broken while she was taking him out of his crib in the middle of the night. As she later described the incident at trial:

*276 "Around 4:00 [a.m.] he wakes up. I was already tired. . . . I rolled over to pick him up. . . . He has a habit of sticking his legs out through [the rails of the crib]. . . . So, I rolled over. I was tugging at him because I'm like half asleep, and he was still crying. So I picked him up a couple of times . . . laid him down, . . . breastfed him, burped him, and laid him on the pillow. I didn't put him back in the crib."
The mother told the DCF caseworker that when the baby caught himself in his cradle she "yanked him out too hard." About a day after the "yanking" she said she became aware of a "click" in his leg while changing his diaper. She noticed that the leg was swollen, that he was quite fidgety and would cry when she touched his leg. Thinking that the leg was only dislocated, she called a cab to take her to the hospital.
The DCF caseworker testified that when she spoke to the mother at the hospital she noticed fresh scratch marks on her neck. The mother admitted upon questioning by the caseworker that she and the father "got into it." The mother initially told the caseworker that she had no idea how the femur was broken and only later admitted that the baby had been kicking the crib railing and that someone else had babysat for the child. The caseworker also testified that only a few days before the broken leg the mother had told the caseworker that she was fearful of admitting to continuing her relationship with the father because M.M. might be removed.
Dr. Philip Colaizzo, Director of the Child Protection Team for Palm Beach County, testified that the type of pulling described by the mother was improbable, that if a femur could be broken as described by the mother there would be a very high frequency of such accidents. He said that the baby's femur  one of the hardest bones in the body  was three/fourths (¾) to an inch in diameter. From the x-rays he described an angulated break that could not have been self-inflicted. He said the break was the result of a transverse force. He also testified that, in his experience, the type of fracture sustained by M.M. was generally the result of abuse.
After DCF filed the petition for termination, M.M. was sheltered. Before the case came to trial, mother admitted that she called the father during Christmas because she was lonely. The grandmother testified that father stayed with the mother the entire time during their visit. The father testified, initially denying having any contact with mother in June 2006, but then admitting that he had a "face-to-face" argument on June 29th but denied hitting Mother. He did, however, admit to staying with mother over Christmas and that they would see each other and also speak.
The trial court's findings were as follows. Neither the mother nor the father was credible. The mother was not candid about her relationship with the father, giving inconsistent accounts about the father. They both were inconsistent about the June 29th incident. Both versions were incredible and could not be believed. She repeatedly told DCF that they were no longer together, but then that she was happy that she was pregnant with M.M. They spent the holidays together while telling DCF they were still separated. The parents continued their relationship and continued to cohabit but then lied about it.
There was an incident of domestic violence at or about the same time of the broken femur, as shown by the fresh scratch marks on the mother's neck. The broken femur resulted from something more than mere negligence, expressly relying on the Doctor's testimony. Her explanation of how the injury occurred was expressly rejected. By the mother's own *277 testimony, she is responsible for the broken femur. The mother caused the broken bone and failed to seek medical care for more than 24 hours afterward. The force required for the injury was consistent with the definition of "egregious conduct." The mother's conduct has created a serious risk of harm if M.M. were returned to the mother. Termination of the parental rights of both is in the best interests of M.M.
"It is well-settled that, where the trial court's finding that there is `clear and convincing' evidence to terminate parental rights is supported by competent substantial evidence [the appellate court has] no choice but to affirm." D.S. v. Department of Children & Families, 842 So.2d 1071, 1072 (Fla. 4th DCA 2003); R.S. v. Department of Children & Families, 831 So.2d 1275, 1277 (Fla. 4th DCA 2002). As the court explained in In re Adoption of Baby E.A.W., 658 So.2d 961 (Fla.1995):
"[The appellate court's] task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute [its] judgment for that of the trier of fact. Instead [it] will uphold the trial court's finding "[i]f upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court's judgment in favor of terminating . . . parental rights."
658 So.2d at 967.
Section 39.806(1)(f)2 defines egregious conduct as "abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct." The mother argues that the evidence does not prove such conduct. She points to Dr. Colaizzo's concession that he could not say definitely that the injury could not have happened as the mother testified. She argues that to find egregious conduct, the court had to reject not only her testimony, but the expert's as well. Moreover, she contends, there was no evidence indicating that the father was present when the baby was injured.
The mother misunderstands the impact of an adverse credibility determination and mischaracterizes the Doctor's testimony. It is true that her lack of credibility was a significant factor in finding egregious conduct. But as the opinion in Baby E.A.W. makes clear, we have no authority to reweigh her testimony and find it credible. The fact is that the mother's attempted explanation for the serious injury to her baby while in her care was expressly rejected by the finder of fact. The doctor's testimony was not that her account was probable  only that it was possible  but that given the circumstances her explanation was improbable. It was the role of the trial judge to decide whether she was believable and the expert's opinion was reliable.
The principal reason for termination was the prospect of serious injury if the child was returned to the mother. In the seminal case in Florida discussing prospective abuse, our supreme court stated that:
"To protect the rights of the parent and child, we conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child."
Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991). In prospective abuse cases DCF must prove a connection between past acts of abuse and the prospect that it will occur again. See D.H. v. Department of Children *278 & Families, 769 So.2d 424 (Fla. 4th DCA 2000). The issue in these cases is whether future behavior adversely affecting the child can be "clearly and certainly predicted." L.B. v. Department of Children & Families, 835 So.2d 1189, 1195 (Fla. 1st DCA 2002). Stated another way, the issue is whether it is likely to happen or expected. In re J.L., 824 So.2d 1023, 1025 (Fla. 2d DCA 2002).
In this case, there was evidence that the father had violently abused the mother multiple times in the past. In fact, his violence was the reason her first son was taken away from her and placed with his biological father. The June 29 incident also definitely involved violence by the father. The DCF caseworker testified that the mother admitted that she and the father "had gotten into it" when confronted about the scratches on her neck in the hospital. Moreover, the mother failed to take M.M. to the hospital for more than 24 hours after the incident causing his broken femur.
The trial judge's finding was expressly based on clear and convincing evidence. There is evidence in the record that, if believed by the finder of fact, supports the finding that the conduct of both parents was egregious. Although there was no eyewitness to a violent act, there is strong circumstantial evidence supporting the finding. As the Doctor made clear, the broken femur is a serious, significant and substantial injury  especially to a three month old who does not walk, jump, or crawl. The size of the fractured bone required very substantial force to cause the break, and the mother's explanation was scientifically unlikely as the source. The delay in taking the child to seek medical care was also significant.
The history of violence in the relationship, the lying about the relationship being finished, the failure of the mother to protect the child from the father  all of these add mightily to the finding of prospective future abuse. The mother had already lost custody of her older child on account of this man's violence in the relationship. How many children have to suffer injuries, and how many times, and how much more severe the injury, before the law may permanently end their exposure to this repeated danger?
Affirmed.
TAYLOR, J., and DAVIDSON, LISA, Associate Judge.