# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT
_____

In the Interest of K.R. and C.L., children.

S.T.,

Appellant,

v.

DEPARTMENT OF CHILDREN AND FAMILIES and
STATEWIDE GUARDIAN AD LITEM OFFICE,

Appellees.

No. 2D2025-2006
_____

April 8, 2026

Appeal from the Circuit Court for Hillsborough County; Lisa D. Campbell, Judge.

Thomas J. Butler of Thomas Butler, P.A., Miami Beach; and Clay W. Oberhausen, Office of Criminal Conflict & Civil Regional Counsel, Sarasota, for Appellant.

Mary Soorus, Appellate Counsel, Children's Legal Services, Tampa, for Appellee Department of Children and Families.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, Tallahassee; and Jamie Billotte Moses, Statewide Guardian ad Litem Office, Defending Best Interests, MMPO Defense, Orlando, for Appellee Statewide Guardian ad Litem Office.

SMITH, Judge.

S.T. (the Mother) appeals the trial court's final judgment terminating her parental rights to her children, K.R. and C.L., under section 39.806(1)(f), Florida Statutes (2024). Because the evidence before the trial court was insufficient to support termination of the Mother's parental rights, we reverse the portion of the final judgment that pertains to the Mother.[1]

On May 2, 2023, the Department of Children and Families filed an expedited petition for the termination of parental rights as to K.R. and C.L. against the Mother pursuant to section 39.806(1)(f) based upon egregious conduct. The petition alleged that on December 22, 2022, the Mother's boyfriend,[2] with whom the Mother and her two children were living, entered the children's room and began punching and strangling C.L. while K.R. slept in the same bed.[3] The petition alleged that the Mother viewed recordings from a baby monitor showing the abuse. The video clips are disturbing. The Mother took the children to the hospital, but she refused the hospital's request to X-ray C.L. and left the hospital without signing the discharge paperwork. The petition further alleged that the Mother delayed reporting the incident for two months while she and the children continued to live with the boyfriend. The Department learned of the abuse when the Mother voluntarily reported the abuse to law enforcement.

---

[1] The final judgment also (1) terminates the parental rights of A.R., the father of K.R., and (2) denies the expedited petition for termination of the parental rights of C.L.'s father. We make no comment as to the portions of the final judgment that pertain to either father.

[2] The boyfriend is not the father of either K.R. or C.L.

[3] C.L. was twenty-two months old at the time of the incident; K.R. was four years old.

In support of termination pursuant to section 39.806(1)(f), the Department alleged that the Mother engaged in egregious conduct or, in the alternative, that she had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatened the life, safety, or physical, mental, or emotional health of the children. Specifically, the Department alleged that the Mother allowed the boyfriend continued access to the children and failed to timely acknowledge the danger and risk the boyfriend posed to the children. Because the Department sought termination under subsection 39.806(1)(f), the Department did not, and was not required to, make "[r]easonable efforts to preserve and reunify" the family. *See* § 39.806(2).

At the final hearing, the Mother testified that on the night in question, she awoke from sleep upon being alerted by the baby monitor. She saw three video clips capturing the boyfriend punching, choking, and shaking C.L. She immediately went to check on the children and confronted the boyfriend, who denied any wrongdoing. The boyfriend drove the Mother and the children to the hospital because she did not have a car. While at the hospital, C.L. was examined and it was recommended that C.L. have an X-ray. But the Mother left the hospital without C.L. having the X-ray because she feared that the children might be taken from her.[4] The Mother's boyfriend then took the Mother and children back to his house.

The Mother testified that upon returning to the house, she was worried about the children being around the boyfriend, so she packed up

---

[4] Hospital records admitted at the hearing show that a suspected abuse report was sent to the Department on December 22, 2022. No records were received into evidence demonstrating that the Department received the abuse report.

3

their things and moved the children from the house. According to the Mother the children alternated staying with C.L.'s father[5] and the maternal grandmother. The Mother testified that the children never moved back into the house with the boyfriend after the incident and that she no longer allowed him access to them. However, she admitted that she continued to live with the boyfriend after the incident.

The Mother conceded that she did not immediately notify police of the incident; in fact, she waited almost two months before reporting the abuse. She explained that the incident had been bothering her and that a coworker finally convinced her to report the abuse.

The detective who investigated the abuse report testified that she interviewed the Mother three times. The Mother showed the videos to the detective, identified her boyfriend as the perpetrator, and voluntarily spoke with police. During the first interview, the Mother denied that the boyfriend went to the hospital with them. The Mother told the detective that after they left the hospital, she took steps to have the children removed from the boyfriend's residence and the children had not been back to the boyfriend's house and had not seen the boyfriend since the abuse.

The detective stated that during the second interview the Mother maintained that she never let the children see the boyfriend again after the incident. The recording of the second interview was played. After the detective told the Mother that the boyfriend had been arrested and that he admitted to abusing C.L., counsel for the Mother objected to the next portion of the interview, in which the detective told the Mother what the

---

[5] C.L.'s father testified that while he was not the biological father of K.R., he treated K.R. as his own child and continued to do so after his relationship with the Mother ended.

4

boyfriend allegedly said to law enforcement after he was arrested, arguing the statements were hearsay. The court overruled the hearsay objection, and the recording was played. During the interview, the detective told the Mother that the boyfriend told law enforcement that he took the Mother and children to the hospital, that he brought them back to his house, and that the children had been at his house, with the Mother, the entire time. The Mother denied that the children continued to stay at the boyfriend's house. The detective then told the Mother that law enforcement also confirmed with the maternal grandmother that the children were not staying with her; the detective told the Mother this was the last chance to tell her what really happened. The Mother insisted that she was telling the truth—that the children never again stayed at the boyfriend's house or had any interactions with the boyfriend. She admitted that she and C.L.'s father continued to use the boyfriend's house as their pick-up and drop-off location for the children pursuant to their coparenting agreement but insisted that the children did not go inside the house and did not see the boyfriend.

The detective then testified regarding the third interview, stating the Mother reapproached her and admitted that the boyfriend had, in fact, taken her and the children to the hospital and then drove them back to his house. When the detective asked the Mother if she stayed the night at the boyfriend's house after they returned from the hospital, the Mother responded that she stayed because she was scared but she was adamant that the children never slept there after that day. She told the detective that the children went to C.L.'s father's house and then they went to the maternal grandmother's house.

C.L.'s father testified and confirmed that he picked up and dropped off the children outside of the boyfriend's house during the time-sharing

exchanges. He testified that when he arrived the children were never inside the house but were always waiting with the Mother outside—he has never met the boyfriend.

We note that the Mother's testimony at the hearing generally tracks her statements to the detective: that she removed the children from the boyfriend's home the night of the abuse and that the children never returned to the home or had contact with the boyfriend after the incident. Neither the boyfriend nor the maternal grandmother testified, and there was no other evidence adduced related to where the children were living after the incident.

In the final judgment the trial court found that "[i]n the weeks and months in which [the] Mother continued to live with [the boyfriend], [the] Mother was in fear of him . . . and continued to expose her children to [the boyfriend] in some measure for a full two months after she had witnessed the beatings on the videos." The trial court expressly rejected the Mother's testimony that she moved the children out of the boyfriend's house and that the children thereafter lived exclusively with C.L.'s father and the maternal grandmother. The trial court noted that "[t]he maternal grandmother, with whom [the] Mother claimed the children lived, was not called as a witness to corroborate the Mother's testimony." The trial court ultimately made an express finding that the Mother lacked credibility.

In the final judgment, the trial court commented on the Mother's hearsay objections noting the

> Mother's defense to the Petition centers around facts and allegations that she dismisses as just "hearsay." This includes statements that both [the boyfriend] and [the maternal grandmother] made to the police, confirming that the children continued to live continuously and uninterrupted

6

in the home with [the boyfriend] following the December 2022 abuse.

The trial court's decision expressly states that "[r]egardless of whether the children had spent any or every night at [the boyfriend's] house after December 2022, the evidence was clear that [the] Mother continued to expose her children in some fashion to a man who committed a monstrous act of abuse toward her children." This behavior, the trial court found, constitutes "egregious conduct" pursuant to section 39.806(1)(f), supporting the termination of the Mother's parental rights. The Mother timely appealed.

I

To grant a petition for termination of parental rights, the trial court must find that the Department proved a statutory ground for termination, that termination is in the manifest best interest of the child, and that termination was the least restrictive means of protecting the child. *See R.C. v. Dep't of Child. & Fam. Servs.*, 33 So. 3d 710, 714 (Fla. 2d DCA 2010). It is the Department's burden to prove the allegations supporting termination by clear and convincing evidence. *Id.* (citing *E.E.A. v. Dep't of Child. & Fam. Servs.*, 846 So. 2d 1250, 1251-52 (Fla. 2d DCA 2003)); *see also M.B. v. Dep't of Child. & Fams.*, 326 So. 3d 72, 74 (Fla. 4th DCA 2021) ("Termination of parental rights should not be based on speculation."). The Florida Supreme Court has defined clear and convincing evidence as an "intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." *G.W.B. v. J.S.W.*, 658 So. 2d 961, 967 (Fla. 1995) (alteration in original) (quoting *In re Davey*, 645 So. 2d 398, 404 (Fla. 1994)).

7

We review the trial court's order to determine whether the trial court's findings are supported by competent, substantial evidence. *T.V. v. Dep't of Child. & Fam. Servs.*, 905 So. 2d 945, 946 (Fla. 3d DCA 2005) ("The standard of review in a case where the trial court terminates parental rights is whether the judgment is supported by substantial and competent evidence."); *see also R.C. v. Dep't of Child. & Fam. Servs.*, 33 So. 3d 710, 714 (Fla 2d DCA 2010) ("Where the trial court's finding that there is clear and convincing evidence to terminate parental rights is supported by competent, substantial evidence, the appellate court has no choice but to affirm."); *M.B.*, 326 So. 3d at 74 ("[T]he appellate court's task is not to reweigh the evidence or make credibility determinations of the witnesses, but rather, to ensure that competent substantial evidence supports the trial court's ruling.").

II

In this case, the Department filed its expedited petition for termination of the Mother's parental rights under section 39.806(1)(f), which provides grounds for termination of parental rights when a parent has

> engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling. Proof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required.

The statute further provides:

> As used in this subsection, the term "egregious conduct" means abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.

§ 39.806(1)(f)2. "Egregious conduct" requires a connection between the activity or conduct involved and abuse or neglect or specific harm to the child. *See K.R. v. Dep't of Child. & Fam. Servs.*, 843 So. 2d 366, 368 (Fla. 2d DCA 2003) (holding that "past drug use alone without connecting the drug use to any abuse, neglect, or specific harm to the child" is insufficient to establish "egregious conduct"); *P.S. v. Dep't of Child. & Fam. Servs.*, 863 So. 2d 392, 394 (Fla. 3d DCA 2003). We have held that egregious conduct includes that situation where "a parent who was not present during, or who did not participate in [the abuse, neglect or specific harm], . . . knowingly failed to protect the child from egregious abuse." *T.L. v. Dep't of Child. & Fam. Servs.*, 990 So. 2d 1267, 1271 (Fla. 2d DCA 2008) citing *K.A. v. Dep't of Child. & Fam. Servs.*, 880 So. 2d 705, 708 (Fla. 2d DCA 2004), *superseded on other grounds by J.F. v. Dep't of Child. & Fams.*, 198 So. 3d 706, 708 (Fla. 2d DCA 2016).

> The issue we must decide is whether the record contains competent substantial evidence to support the trial court's finding that the Department established by clear and convincing evidence that the Mother (1) engaged in egregious conduct, or (2) had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental or emotional health of the Children.

*M.C. v. Dep't of Child. & Fams.*, 186 So. 3d 74, 79 (Fla. 3d DCA 2016) (holding that a trial court's determination that clear and convincing evidence supports the termination of parental rights will not be overturned unless found to be clearly erroneous or lacking in evidentiary support).

### III

The Mother argues that the Department fell short of its burden to prove that she "(1) engaged in egregious conduct, or (2) had the opportunity and capability to prevent and knowingly failed to prevent

9

egregious conduct that threatens the life, safety, or physical, mental or emotional health of the Children." *See M.C.*, 186 So. 3d at 79. We agree.

Here, the Department's theory of the case is that the Mother continued to subject her children to harm by allowing the children to stay with her and the boyfriend. Contrary to the Department's theory, the Department presented no such admissible evidence.

The only evidence presented as to the children's living arrangements after the abuse was presented through the Mother's testimony. The trial court rejected the Mother's testimony as not credible, which is a finding the trial court has broad discretion to make in weighing the evidence. *See M.B.*, 326 So. 3d 74. But the fact that the trial court did not find the Mother credible does not satisfy the Department's burden of proving egregious conduct by the Mother. *See M.C.*, 186 So. 3d at 78-79 (noting that the trial court found the mother not credible but holding that there still must be competent substantial evidence to support the trial court's finding that the Department established by clear and convincing evidence that the mother engaged in egregious conduct).

Moreover, contrary to the trial court's findings, clear and convincing evidence cannot be satisfied by inadmissible hearsay. *See Johnson v. Dep't of Health & Rehab. Servs.*, 546 So. 2d 741, 744 (Fla. 1st DCA 1989) (holding that evidence was not clear and convincing where the only documents supporting HRS's case were inadmissible hearsay). In this case, for reasons not apparent from the record, the Department did not call the boyfriend or the maternal grandmother as witnesses at the hearing but instead relied upon the detective's testimony regarding what the boyfriend and grandmother allegedly said to law enforcement to prove that the Mother continued to expose the children to the boyfriend

10

following the abuse.[6]  This was classic inadmissible hearsay.  *See* § 90.801(b), Fla. Stat. (2024).  As such, the trial court's finding that the Mother continued to expose the children to the boyfriend after the abuse can be based on nothing but pure speculation.  *See, e.g., M.C.*, 186 So. 3d at 80 ("We conclude that the trial court's finding that the Mother engaged in 'egregious conduct' is based on pure speculation.  There is no evidence as to how the injury occurred or who or what caused the injury.").  Accordingly, the record is devoid of clear and convincing evidence that would support the trial court's termination of the Mother's

---

[6] The fact that the <u>Mother</u> stayed with the boyfriend after the incident is not, in and of itself, a basis to terminate her parental rights.  Courts have recognized that

> [i]t is well-established that "extricating oneself from an abusive relationship can pose an extremely difficult hurdle for victims of domestic violence."  [*L.M. v. State*], 453 P.3d 651, 653-54 (Utah Ct. App. 2019).  In this vein, the victim "might have been isolated from [his or] her family by the abuser, [he or] she may not be able to afford to go, or [he or] she may realize that leaving is more dangerous than staying."  *Weiand v. State*, 732 So. 2d 1044, 1054 (Fla. 1999) (citation omitted).

*L.C.A. v. Dep't of Child. & Fams.*, 319 So. 3d 671, 677 (Fla. 3d DCA 2021) (third, fourth, and fifth alterations in original) (footnote omitted).  This may be a fact that bears upon the question of whether termination of the Mother's parental rights is the least restrictive means of protecting the children.  *Id.* at 677-78 (" '[T]he least restrictive means of protecting the child[] would have been for [the Department] to assist [the mother], the victim of domestic violence, in gaining an injunction against the [father] under Chapter 39 (if necessary),' and offering services for her to achieve independence from her abuser, including those designed to facilitate the relocation process." (second, third, fourth, and fifth alterations in original) (quoting *T.B. v. Dep't of Child. & Fams.*, 299 So. 3d 1073, 1080 (Fla. 4th DCA 2020))).  Here, because the Department sought termination of the Mother's rights under section 39.806(1)(f), it was not required to prove that termination was the least restrictive means.

parental rights.[7]  *See Schaffer v. State*, 769 So. 2d 496, 498 (Fla. 4th DCA 2000) ("Where the implication from in-court testimony is that a non-testifying witness has made an out-of-court statement offered to prove the defendant's guilt, the testimony is not admissible.").

To the extent that the petition alleged and the trial court made findings related to the Mother's admitted action of leaving the hospital without having C.L. submit to X-rays, as recommended by hospital staff, we recognize that the failure to obtain medical attention can constitute egregious conduct.  *See P.R. v. Dep't of Child. & Fams.*, 337 So. 3d 456 (Fla. 1st DCA 2022) (affirming termination of parental rights where there was expert testimony that a five-week-old presented to emergency room with new and old fractures that occurred seven to ten days earlier but had gone untreated; the expert also testified that infant would feel pain from these injuries, caregiver would know that the infant was in pain or distress, and injuries were life-threatening); *J.R. v. Dep't of Child. & Fams.*, 28 So. 3d 117 (Fla. 5th DCA 2010) (holding termination was appropriate where the father knew the child was injured and virtually nonresponsive because of head-trauma caused by the wife, the father neglected to seek medical attention for over six hours, and the child died); *P.I. v. Dep't of Child. & Fams.*, 14 So. 3d 1173 (Fla. 3d DCA 2009) (holding termination was supported by competent substantial evidence where there was expert testimony established the child was lethargic and

---

[7] The Mother further argues that the trial court improperly shifted the burden of proof to the Mother to disprove the Department's case. While the trial court made note in its final judgment that "[t]he maternal grandmother, with whom [the] Mother claimed the children lived, was not called as a witness to corroborate the Mother's testimony," we cannot say that this finding alone constitutes impermissible burden shifting given that the trial court relied heavily on the inadmissible hearsay in reaching its determination of egregious conduct.

had bruises on his face and body, there was fluid on his brain resulting from trauma that was four to six weeks old, and the mother was aware of the continued abuse perpetrated by stepfather and failed to protect the children); *T.M. v. Dep't of Child. & Fams.*, 971 So. 2d 274 (Fla. 4th DCA 2008) (affirming the termination of the mother's parental rights where the mother admitted to causing a broken femur in three-month-old and failing to seek medical care for more than twenty-four hours; the expert testified the broken femur was a serious, significant, and substantial injury that would have required "very substantial force"); *D.O. v. S.M.*, 981 So. 2d 11 (Fla. 4th DCA 2007) (noting that the mother noticed the baby twitch three to four days before taking him to the emergency room; expert testimony established that the baby sustained life threatening injuries that were inflicted on multiple occasions and that parents should have been aware that something was wrong with the baby because the baby would have shown signs of distress, including uncontrollable high-pitched crying).

However, all of these cases were supported by expert testimony establishing that the injuries sustained were life-threatening and that the parents or caregivers must have known that the injuries were serious and required medical attention but failed to seek the same in a timely manner. The same does not hold true here as there was no expert testimony that C.L. suffered life-threatening injuries.

While it is true that the Department's nurse practitioner testified at the hearing that C.L. suffered nerve damage causing her jaw to be crooked, she acknowledged that a lay person would not have noticed. And there are no medical records in the record that would support the nurse practitioner's testimony that C.L. suffers from permanent nerve

13

damage.[8]  The hospital records from the night the Mother took C.L. to the hospital show the physical exam was negative for headache, mental status changes, or a decreased level of consciousness.  The exam notes state that C.L. was "well-appearing" and that while there were two minor abrasions noted on C.L.'s chest, the doctor told the Mother that they "were not able to link these abrasions to the father but it is just something that we noted."  The notes state that the physical exam was "otherwise unremarkable."

Further, neither C.L.'s father nor the Mother noticed any injuries to C.L.  Indeed, after C.L. was sheltered, an X-ray was performed, and it revealed no acute or chronic fractures, no skeletal anomalies, no bone lesions, and no soft tissue abnormalities.  Accordingly, under the facts of this case, the Department failed to present competent substantial evidence that would support a finding that the Mother's leaving the hospital after the physical exam but before an X-ray had been completed rises to the level of egregious conduct.

Because there was no evidence to support the trial court's finding that the Mother engaged in "egregious conduct" by continuing to expose the children to the boyfriend after the abuse or by leaving the hospital after the physical exam but before an X-ray could be completed, we reverse the portion of the final judgment that terminates the Mother's

_____

[8] The record on appeal includes an August 2, 2023, motion for medical procedure filed by the Department.  That motion attached an affidavit from Dr. Nalin Patel, which stated that C.L. had been diagnosed with "facial nerve disorder" and required an MRI of her brain/neck.  The motion was granted by order dated August 11, 2023.  More than a year after the motion requesting permission to conduct an MRI, on October 2, 2024, the Department filed a motion for relief/extraordinary relief requesting the court to excuse the Department from subjecting the child to an MRI because after a subsequent evaluation of the child, the ENT in short stated that an MRI is no longer medically necessary.

14

parental rights on an expedited basis and remand to the trial court with instructions that the children remain dependent and that the Department offer the Mother a case plan with a goal of reunification. We note that if the Mother fails to comply with the case plan, the Department may again petition to terminate the Mother's parental rights. *See R.W.W. v. Dep't of Child. & Fams.*, 788 So. 2d 1020, 1025 (Fla. 2d DCA 2001).

Accordingly, we reverse the trial court's order terminating the Mother's parental rights, and we remand for further proceedings.

SILBERMAN and SLEET, JJ., Concur.

_____

Opinion subject to revision prior to official publication.